IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Johnny Bennett, | ) Civil Action No.:2:13-cv-3191-RMG-MGB |
| Petitioner, | ) |
| v. | ) **REPORT AND RECOMMENDATION** |
| | ) **OF MAGISTRATE JUDGE** |
| Bryan P. Stirling, Commissioner, *South Carolina Department of Corrections*; and Joseph McFadden, *Warden, Lieber Correctional Institution*, | ) |
| Respondents. | ) |

The Petitioner, a state prisoner, seeks habeas relief pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Respondents' Motion for Summary Judgment (Dkt. No. 60) and Petitioner's Motion for Summary Judgment (Dkt. No. 67).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1), and Local Rule 73.02(B)(2)(c), D.S.C., this Magistrate Judge is authorized to review the instant petition for relief and submit findings and recommendations to the District Court.

Petitioner filed the instant habeas petition in November of 2014. (*See* Dkt. No. 46.)[1] On January 23, 2015, Respondents filed an Answer and Motion for Summary Judgment. (Dkt. Nos. 59 & 60.) Thereafter, on March 16, 2015, Petitioner filed a Response in Opposition to the Motion for Summary Judgment, his own Motion for Summary Judgment, and a Motion for Discovery. (Dkt. No. 66; Dkt. No. 67; Dkt. No. 68.) Respondents filed a Response in Opposition to Petitioner's Motion for Summary Judgment on April 2, 2015. (Dkt. No. 71).

On June 8, 2015, the undersigned issued an order granting in part and denying in part the Motion for Discovery. (Dkt. No. 78.) Pursuant to that order, Respondents served discovery responses related to Ground Three and submitted documents related to Ground Seven for *in camera* review. (*See* Dkt. No. 80; *see also* Dkt. No. 81; Dkt. No. 85; Dkt. No. 87.)

---

[1]This habeas action was initiated by a Motion to Stay Execution and a Motion to Appoint Counsel filed by Petitioner in November of 2013. (Dkt. No. 1.)

1

After a telephone conference on September 15, 2015, the undersigned issued an order requiring Respondents to produce specified documents to Petitioner within twenty days. (*See* Dkt. No. 91; *see also* Dkt. No. 90.) That order further stated, "To the extent that either party wishes to supplement their Motion for Summary Judgment or related filings, such supplements are due within fifty days of the date of this Order." (Dkt. No. 91 at 1.) Via filings on November 4, 2015, both Petitioner and Respondents indicated that further briefing was not necessary. (*See* Dkt. No. 94; Dkt. No. 95.)

## **PROCEDURAL HISTORY**

The Petitioner is currently confined on Death Row at Lieber Correctional Institution of the South Carolina Department of Corrections ("SCDC"). In September of 1993, the Lexington County Grand Jury indicted Petitioner for murder, kidnapping, armed robbery, and larceny of auto. (*See* Dkt. No. 24-20 at 298–301.)[2] In March of 1993, the State served Petitioner with a Notice of Intent to Seek the Death Penalty and Notice of Evidence in Aggravation.  (*See* Dkt. No. 24-20 at 7.)

Petitioner proceeded to a jury trial before the Honorable Ralph King Anderson, Jr. on October 9 through October 18 of 1995. (Dkt. Nos. 24-13 at 248 through 24-19 at 473.) Petitioner was represented by Wayne Floyd and H. Patterson McWhirter, Esquires. (Dkt. No. 24-13 at 3).  The jury found Petitioner guilty as charged. (*See* Dkt. No. 24-18 at 248–51.) In a separate sentencing proceeding, the jury imposed a death sentence for the murder conviction. (*See* Dkt. No. 24-19 at 461–66.) Judge Anderson additionally sentenced Petitioner to incarceration for twenty-five (25) years for armed robbery and to incarceration for ten (10) years for larceny of auto, to run consecutively.[3] (*See* Dkt. No. 24-19 at 470–71.)

---

[2] Petitioner was originally indicted in March of 1991, but those indictments were nolle prossed by the State due to errors contained therein.

[3] In accordance with state law, the court did not impose a sentence for kidnapping.

2

**First Direct Appeal**

Petitioner appealed and was represented by Daniel T. Stacey, Chief Attorney of the South Carolina Office of Appellate Defense. (*See* Dkt. No. 25.) In his Final Brief of Appellant, Petitioner raised the following issues:

1. Whether the court erred when it qualified juror [R.R.], because his voir dire questions indicated that he would go with the majority rather than stand up and not give appellant the death penalty in violation of the Sixth Amendment right to a fair and impartial jury, the Eight [sic] Amendment right against cruel and unusual punishment, the Fourteenth Amendment right to due process of law?

2. Whether the court erred when it permitted a situation wherein defense counsel was advised by the victim's father, Mr. Smith, that the solicitor had told him not to talk to defense counsel, resulting in a due process deprivation and hindering counsel's Sixth Amendment obligation to prepare properly for trial, where Mr. Smith was a key witness both at the guilt and the sentencing phases of the trial?

3. Whether the court erred when it permitted evidence that appellant was having another person sell drugs, improperly putting his character in evidence?

4. Whether the court erred when it instructed the jury, with respect to a potential verdict of armed robbery, that it could consider a hand or fist as a deadly object or weapon? This improperly stated the statutory requirement of some deadly weapon other than the human body. This violated the Fifth and Sixth Amendment right to have the jury properly charged on every element of the offense.

5. Whether the court erred and denied due process of law, when it did not direct a verdict on the kidnapping conviction and aggravating circumstance, because the state did not prove *corpus delicti* aliunde the extra-judicial statement of appellant?

6. Whether the court erred when it submitted the torture aggravating circumstance to the jury, because the evidence failed to support such a finding beyond a reasonable doubt?

7. Whether the admission of invalid aggravating circumstances was harmless error under *Chapman v. California*.

8. Whether the trial court erred when it admitted over objection at the penalty phase gruesome color photographs at the scene and at the autopsy because they showed damage not inflicted by appellant, and their probative value was outweighed by their prejudicial and emotional effect?

9. Whether the court erred when it denied appellant the ability to make a religious point in his sentencing argument to the jury, depriving him of his right to be fully heard and to make an argument under the death penalty statute?

10. Whether the court erred and violated both the Eighth Amendment and the Fourteenth Amendment to the United States Constitution when it refused appellant's request to charge the jury that, should it find a life sentence with the existence of statutory aggravating circumstances, the defendant would have to serve a minimum of thirty years without parole?

11. Whether the court erred and denied the Sixth Amendment right to impeach and confront witnesses when it prevented defense access to potential impeachment or *Brady* material involving appellant's alleged misconduct in jail?

12. Whether the court erred when it denied appellant's motion for a continuance upon the state's production of a potentially exculpatory "911" tape less than one week before the trial, where the state had possession of this tape for five years?

(Dkt. No. 25 at 7–9.) In an opinion filed on December 1, 1997, the Supreme Court of South Carolina affirmed Petitioner's convictions but reversed his death sentence and remanded for a new sentencing proceeding. *State v. Bennett*, 328 S.C. 251, 493 S.E.2d 845 (1997) (*Bennett I*).

**Resentencing Proceeding**

In July of 2000, Petitioner proceeded to a resentencing trial before the Honorable Marc H. Westbrook and a jury. (Dkt. No. 25-5 at 24.) Petitioner was represented by Wayne Floyd, Esquire, and Assistant Public Defender Hervery B.O. Young, Esquire, during the proceeding. (Dkt. No. 25-5 at 24.) The jury imposed a death sentence, finding the existence of the following aggravating circumstances: that the murder was committed while in the commission of robbery while armed with a deadly weapon; that the murder was committed while in the commission of larceny while armed with a deadly weapon; that the murder was committed while in the commission of kidnapping; and that the murder was committed while in the commission of physical torture. (Dkt. No. 25-12 at 172–74.) Judge Westbrook sentenced Petitioner to thirty (30) years incarceration on the armed robbery and five (5) years incarceration on the larceny of a vehicle, to run concurrently.[4] (Dkt. No. 25-12 at 180–82).

---

[4] Judge Westbrook additionally sentenced Petitioner to thirty (30) years incarceration on the kidnapping charge, but he recognized the kidnapping sentence was subsumed by the murder sentence.

**Second Direct Appeal**

Petitioner timely appealed and was represented by Assistant Appellate Defenders Robert M. Dudek and Aileen P. Clare, Esquires, of the South Carolina Office of Appellate Defense. (*See* Dkt. No. 25-13 at 225 through 25-14 at 26.) In his Final Brief of Appellant, Petitioner raised the following issues:

> 1.  Whether the court erred by allowing the mothers of the 1988 Pizza Huts [sic] assault victims, Ms. Brady and Ms. McGough, to testify about the extent of their sons' injuries and their effects since this constituted impermissible victim impact evidence that did not pertain to the crime for which the appellant was on trial?
>
> 2.  Whether the court erred by admitting photographs of the 1988 Pizza Hut incident victims, Shannon Gilbert and Aaron McGough, since the photographs were irrelevant, and they went beyond the permissible testimony about the fact of the crime itself, and they were intended to inflame the passions of the jury?
>
> 3.  Whether the court erred by allowing Shannon Gilbert, a victim of the 1998 [sic] Pizza Hut assault, to testify that he had dreams as a result of the incident in which Indians, that he thought were black, attempted to kill him, since this evidence was irrelevant and highly prejudicial?
>
> 4.  Whether the court erred by refusing to declare a mistrial where the solicitor asked inmate Byron Collins whether he remembered prison guard Judy Hardee, "the blond-haired lady," since the solicitor was impermissibly injecting race into the case before an all white jury by assuring that the jury understood appellant was having a continuous interracial sexual relationship with Hardee, a white prison guard?
>
> 5.  Whether the court erred by refusing to grant a new trial where the solicitor in his closing argument compared appellant to King-Kong and a Caveman since the court erroneously ruled these were not impermissible and objectionable racial stereotypes that this Court ruled in *Toyota of Florence, Inc. v. Lynch* were unacceptable in the courts of this state?
>
> 6.  Whether the court erred by refusing to allow defense counsel to ask the same "would you just vote with the majority" series of questions that resulted in the reversal of appellant's initial death sentence, since this was legitimate and valuable defense *voir dire*?

(Dkt. No. 25-13 at 231–32.) In an opinion filed on June 26, 2006, the Supreme Court of South Carolina affirmed Petitioner's death sentence. *State v. Bennett*, 369 S.C. 219, 632 S.E.2d 281 (2006) (*Bennett II*).

Assistant Appellate Defenders Dudek and Clare subsequently filed a Petition for Writ of Certiorari on Petitioner's behalf in the United States Supreme Court on September 22, 2006. (Dkt. No. 25-14 at 111–74). The United States Supreme Court denied certiorari on November 27, 2006. (Dkt. No. 25-14 at 226).

**Post-Conviction Relief Action**

On September 7, 2006, Petitioner filed his initial application for post-conviction relief ("PCR"). (Dkt. No. 25-14 at 227–34). Thereafter, he filed a first amended application and a second amended application. Petitioner raised the following grounds for relief in his Second Amended Application for Post-Conviction Relief:

10(a)    Applicant was denied due process under the Fifth and Fourteenth Amendments to the United States Constitution and South Carolina law by the repeated and prejudicial injection of race throughout the trial. Furthermore, these comments resulted in a decision that was based on passion, prejudice or caprice.

11(a)    These include the following injections of race by the Solicitor:

1. "You give him life, the real Johnny will come back. You give him life and he'll come back out. Meeting him again will be like meeting King Kong on a bad day." Tr. 2079. The Solicitor subsequently explained that the use of the term King Kong "wasn't an a [sic **purely** racial statement." Tr. 2179 (emphasis added).

2. "That's Johnny Bennett for you, folks. That's what he thinks about another person, another human being. There ain't no joy in Happy Town. He turned it into gruesomeville. It's **boo hill**.["] Tr. 2071 (emphasis added).

3. The State introduced copious testimony concerning the defendant's assault on two white teenagers. During that testimony, the victim, Shannon Gilbert, was allowed to testify about a recurring dream he had in which "black indians" were chasing him and trying to kill him. Tr. 1027-28.

4. Testimony about the defendant's conduct in prison elicited the following statement from Sandra Key: "a group of black inmates and white inmates had been fighting." Tr. 1077. The witness continued

after objection, "Well, he don't want me to say white, but the particular inmate that had the bruise was white." Tr. 1079.

5. Testimony of James Earl Harris: "He was—he [Bennett] told me that if an individual came in the jail, and depending on their demeanor or if it's a black female correctional officer and if it was a white inmate coming in, they would call the black female correctional officers niggers, and they would take the inmate up on the floor where Mr. Bennett was and they would look at him and wink at him, give him a sign, and Mr. Bennett would straighten the inmate up. He would whoop up on the inmate, is what he was telling me." Tr. 1515.

6. In further direct to the above answer, the Solicitor again reiterated that white individuals would be assaulted by the defendant, "And this would happen to both black and white inmates." Tr. 1516.

7. The State introduced evidence that the defendant was having sex with Judie Hardee, a white woman and made sure the jury knew she was white with the following testimony: Q. There was one guard that loved Johnny Bennett and that was Judie Hardee, you remember her? A. The real big lady? Q. Judie Hardee, you remember her, the blonde-headed lady? A. She was a real big lady. Tr. 1979-80. In closing argument the Solicitor continued to remind the jury of this relationship. Tr. 2077, 2080.

10(b)  Applicant's right to an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated by the seating of a juror who held racist views.

11(b)  At least one juror who sat on the jury at applicant's resentencing trial harbored racist feelings towards applicant.

10(c)  Applicant was denied the right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and South Carolina law at the sentencing phase of his trial. *Williams v. Taylor*, 592 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984); *Jolly v. State*, 314 S.C. 17, 443 S.E.2d 566 (1994).

11(c)  The facts supporting this claim are as follows:

1. Trial counsel failed to object to the trial court's instruction to the jurors that any mistakes he made would be corrected at the appropriate time. "Now, if I'm wrong there is a time and place for it to be corrected." Tr. 899. "You must accept as correct the laws as I give it

to you. Now, if I'm wrong there is another time and place for it to be corrected." Tr. 2122.

2. Trial counsel failed to object to the testimony of Jody Gallman of the South Carolina Department of Probation, Parole and Pardon Services. The sole purpose of this witness' testimony was to establish that when applicant committed the crime for which he was being sentenced, he was on parole. This evidence, raising the specter of his being paroled again, was substantially more prejudicial than probative. Tr. 1105-1108.

3. Trial counsel brought to the jury's attention the fact that applicant was already on death row. Tr. 1604. Moreover, a defense witness while on direct examination, twice referenced "death row." Tr. 2048.

4. Trial counsel failed to object adequately to the trial court's instruction in response to the jury's question about the meaning of a life sentence. In response to a note asking whether life meant life without parole or with the possibility of parole the trial court stated the following: "Let me tell you that the only thing I'm allowed to comment on that—and you understand that there are all sorts of varieties in this thing and it's something that I can't get into with you directly. All I can do is basically give to you the charge that I gave you earlier." Tr. 2144-45.

5. Trial counsel failed to object to the use of both larceny and robbery as aggravating factors.

6. Trial counsel failed to object to the introduction of evidence regarding the prior crime involving an assault in the parking lot of a Pizza Hut restaurant on the basis that the admission of this evidence violated applicant's right to due process.

7. Trial counsel failed to object to prejudicial and improper statements by the prosecution during the opening statement and closing argument of the sentencing phase of applicant's trial. During the opening statement, the prosecution referred to applicant as "brutal monster size," (tr. 907); "big old brute, Johnny Bennett," (tr. 907); "But his disregard for a fellow human being, his disrespect for the law, his total disobedience and disrespect for good old human nature began way back, probably when he was born." (tr. 908); "And, folks, you know about 25 feet away from you in your presence is a murderer. I hope you never have to live through this after this week, being that close to a murderer." (tr. 909); "big old bear of a fellow, Johnny Bennett," (tr. 914); "big old bear of a fist," (tr. 915); "evil, mean, manipulative, malicious. That's what we're dealing with, folks. . . . you will find enough aggravation that will be spilling over this jury box. All we ask you is to return the punishment that fits the crime in this evil, manipulating, malicious murdering defendant." (tr. 915-16). During the closing argument the prosecutor stated that if "You give him life, the real Johnny will come back. You give him life and he'll come

8

back out." (tr. 2079); "There ain't no joy in Happy Town. He turned it into gruesomeville. It's boo hill." (tr. 2071); argument that if not executed the applicant would be able to have sex with "the blonde lady." (tr. 2077); "if you [the jury] don't sign your name for Benton Smith his life would have been nothing." Tr. 2081. Trial counsel failed to object to the prosecutor's repeated reference to applicant using derogatory and racists terms: "mountain man," tr. 2056; "caveman," tr. 2062; "tiger," tr. 2066; "monster," tr. 2068; "King Kong," tr. 2079, "beast of burden." Tr. 2079.

8. Trial counsel failed to object to the trial court's instructions which tended to inform the jurors that they could only consider applicant's character in the context of aggravating evidence rather than mitigating evidence. Tr. 2113.

9. Trial counsel raised the issue of the conditions of imprisonment by bringing to the jury's attention applicant's request for television knobs, the use of the microwave, and the use of the canteen. Tr. 1636-38.

10. Trial counsel failed to object to the judge's instruction (tr. 2116) and the Solicitor's argument that torture and kidnapping could occur after the victim's death. "These can be committed after he murdered Benton Smith." Tr. 2057.

11. Trial counsel failed to voir dire on potential racial prejudice during jury selection.

10(d)    Applicant was denied his right to the effective assistance of appellate counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and South Carolina law.

11(d)    The grounds for this claim are as follows:

1. Appellate counsel failed to raise on direct appeal the trial court's refusal to question potential jurors about their attitudes regarding race. *Turner v. Murray*, 476 U.S. 28 (1986).

2. Appellate counsel failed to argue on direct appeal that the admission of evidence of the prior assault in the Pizza Hut parking lot was error because this evidence was irrelevant.

3. Appellate counsel failed to argue on direct appeal that the admission of the evidence about a prior victim's dream of "black Indians" was error because this evidence was irrelevant.

4. Appellate counsel failed to raise on direct appeal the error of informing the jury that applicant was already on death row and the trial court's instruction on the issue which made it more clear that applicant had already been sentenced to death.

5. Appellate counsel failed to raise on direct appeal the pervasive injection of race throughout the trial despite trial counsels' objections.

6. Appellate counsel failed to raise on appeal the trial court's improper version of the "plain and ordinary meaning" instruction. Tr. 2146.

10(e)    Applicant seeks a finding of fact that his kidnapping conviction did not involve sexual misconduct requiring sex offender registration pursuant to S.C. Code §23-3-430. *See Hazel v. State*, __ S.E.2d __, 2008 WL 648513 (2008).

11(e)    In 1998, §23-3-430 was amended to include an exception to the general rule that a kidnapping conviction automatically required sex offender registration. This exception applied if the state court made a finding that the kidnapping offense did not include a criminal sexual offense. §23-3-430(C)(15). Because applicant was convicted of kidnapping before this amendment, this exception was unavailable to him. The South Carolina Department of Corrections has prohibited applicant from visiting with young relatives because of the requirement that he register as a sex offender based on the 1995 kidnapping conviction.

(Dkt. No. 25-15 at 96–100.)

On May 27, 2008, an evidentiary hearing was held before the Honorable James R. Barber, III. (Dkt. No. 25-16 at 10–75.) Petitioner was present and represented by Robert E. Lominack and Derek Enderlin, Esquires. (*See* Dkt. No. 25-16 at 10.) The evidentiary hearing was reconvened on July 11, 2008, but Petitioner waived his presence for that hearing. (*See* Dkt. No. 25-16 at 76–132.) Following the evidentiary hearings, Petitioner submitted a post-trial memorandum (Dkt. No. 25-16 at 184–227), and the State submitted a proposed order (Dkt. No. 25-16 at 228 through 25-17 at 131). The PCR court heard post-hearing arguments on February 17, 2009. (Dkt. No. 25-16 at 133–83.) In an order dated and filed April 3, 2009, the PCR court denied the application for post-conviction relief and dismissed the petition. (Dkt. No. 25-18 at 73–229.)

Petitioner filed a Motion to Alter or Amend Judgment on April 17, 2009 (Dkt. No. 25-18 at 230–40), which was denied by the PCR court in an order dated October 1, 2009 and filed October 8, 2009 (Dkt. No. 25-19 at 186–97). On October 8, 2009, the PCR court filed an Amended Order of Dismissal. (Dkt. No. 25-19 at 31–185.)

**PCR Appeal**

Petitioner, through his attorney Robert E. Lominack, filed a Petition for Writ of Certiorari on

October 7, 2010. (*See* Dkt. No. 26-13.) In that petition, Petitioner raised the following issues:

I.      Mr. Bennett was entitled to twelve impartial jurors. But one juror admitted that after sitting through the trial, he regarded Mr. Bennett as "just a dumb nigger." Yet the PCR court found that this juror had used a "poor choice of words" and did not "view[] African-Americans as inferior to whites" during the time of the sentencing trial. Is this conclusion supported by the evidence?

II.     A capital trial should focus on the character of the defendant and the circumstances of the crime for which he is being sentenced. Yet at Mr. Bennett's capital sentencing the state presented the testimony of five witnesses to recount a 12-year-old cross-racial assault. One witness described a racially-loaded dream, which he connected with the assault. Trial counsel objected to this evidence. Should appellate counsel have raised this issue on direct appeal?

III.    Prosecutors are prohibited from employing arguments designed to appeal to jurors' passions or prejudices. Here, the prosecutor (1) repeatedly referenced Mr. Bennett or the evidence using racially suggestive phrases, (2) injected his personal opinion of the appropriate sentence, and; (3) implied that jurors should be afraid of Mr. Bennett during the trial. Yet the PCR court found that the prosecutor's comments were "fair" in light of the evidence presented. Did the PCR court err?

IV.     Because of the unique opportunity for racial prejudice to affect a capital juror, a defendant has the right to explore potential jurors' racial bias under certain circumstances. Here, the prosecution focused its case on Mr. Bennett's prior conviction stemming from a cross-racial assault. The PCR court—ignoring the cross-racial evidence—ruled that there was no right to question the jurors because the victim was black. Did the PCR court err?

V.      Capital jurors are prohibited from considering parole when determining the appropriate sentence. Here, in response to a jury note, the trial court implied that Mr. Bennett was eligible for parole. Trial counsel objected but appellate counsel did not raise the issue on direct appeal. The PCR court found that the court's instruction as a whole was not objectionable and, therefore, appellate counsel was not deficient. Did the PCR court err?

VI.     Capital jurors' sense of responsibility should not be diminished by the suggestion that their verdict will be reviewed by some other court. Yet during Mr. Bennett's trial the court twice advised the jury that a higher court would

review its rulings.  Trial counsel did not object to these instructions but the PCR court ruled that this failure was neither unreasonable nor prejudicial. Did the PCR court err?

VII.   A capital jury cannot be prohibited from considering any aspect of a defendant's character as a basis for a life sentence.  However, at Mr. Bennett's next trial the court defined "character evidence" only in the context of aggravation.  Trial counsel failed to object and the PCR court ruled that the court's penalty phase instructions as a whole were not objectionable.  Did the PCR court err?

VIII.  At Mr. Bennett's first trial he was convicted of kidnapping, which resulted in an automatic sexual offender registration requirement despite the fact that there was no element or claim that sexual conduct was involved in the crime. Subsequently the sexual offender registration statute was amended to include an exception to the automatic registration requirement.  The PCR court ruled that it was powerless to make the appropriate statutory finding that would exempt Mr. Bennett from the registration requirement.  Did the PCR court err?

(Dkt. No. 26-13 at 8–9.) The South Carolina Supreme Court entered an order denying the petition for a writ of certiorari on November 7, 2013. (Dkt. No. 26-15.) The matter was remitted to the lower court on November 25, 2013. (Dkt. No. 26-16.)

**Petition for Writ of Habeas Corpus**

Petitioner has now filed the instant habeas petition, wherein he raises the following grounds for review (verbatim):

**Ground One**: PETITIONER'S TRIAL WAS RENDERED FUNDAMENTALLY UNFAIR BY THE SOLICITOR'S REPEATED IMPROPER AND PREJUDICIAL INJECTION OF RACE THROUGHOUT THE RESENTENCING TRIAL.

**Ground Two**: PETITIONER'S RIGHT TO AN IMPARTIAL JURY GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE SEATING OF A RACIALLY BIASED JUROR.

**Ground Three**: PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENT[S] WHEN COUNSEL FAILED TO CHALLENGE THE STATE'S RACE-BASED DECISION TO SEEK THE DEATH PENALTY IN PETITIONER'S CASE.

**Ground Four**: PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS WHEN TRIAL COUNSEL FAILED TO VOIR DIRE POTENTIAL JURORS ON THEIR RACIAL ATTITUDES.

**Ground Five:** PETITIONER WAS DENIED THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AT THE SENTENCING PHASE OF HIS TRIAL.

**Ground Six:** PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN APPELLATE COUNSEL FAILED TO PROPERLY RAISE ON DIRECT APPEAL THE STATE'S INTRODUCTION OF EXTRINSIC EVIDENCE OF A 12-YEAR-OLD CROSS RACIAL ASSAULT.

**Ground Seven:** BENNETT WAS DENIED THE SIXTH AMENDMENT RIGHT TO IMPEACH AND CONFRONT WITNESSES WHEN HE WAS PREVENTED ACCESS TO POTENTIAL IMPEACHMENT MATERIAL ON THE STATE'S WITNESSES.

(Dkt. No. 46 at 22, 36, 43, 48, 54, 69, 73.)

## APPLICABLE LAW

**Summary Judgment Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990).

13

**Habeas Standard of Review**

Since the Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320, 322–23 (1997); *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir.1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## **DISCUSSION**

As noted above, Respondents seek summary judgment in the instant case. (Dkt. No. 60; *see also* Dkt. No. 59.) Petitioner also seeks summary judgment on his Grounds One and Two. (Dkt. No. 67.) For the reasons set forth herein, the undersigned recommends granting habeas corpus relief on Petitioner's Ground Two. As to the other grounds for relief, the undersigned recommends granting Respondents' motion for summary judgment and denying and dismissing those grounds.

14

**Petitioner's Crimes**

The South Carolina Supreme Court summarized Petitioner's crimes as follows:

Appellant received several criminal convictions in connection with the murder of Benton Smith (Victim). The evidence established that Victim was last seen leaving his residence accompanied by Appellant. After police and family members searched for Victim for several days, Appellant led police to Victim's body which was buried under wood brush behind Appellant's sister's home. Victim had been stabbed approximately seventy (70) times with a Phillips head screwdriver and died as a result of internal bleeding. Appellant gave conflicting statements to police; first denying any knowledge of Victim's murder, then confessing to the murder, and finally recanting and maintaining his innocence.

*Bennett II*, 369 S.C. at 224, 632 S.E.2d at 284.

**A.**    **Ground One**

Petitioner asserts in Ground One that he was denied a fair trial "by the Solicitor's repeated improper and prejudicial injection of race throughout the resentencing trial." (Dkt. No. 46 at 22.) According to Petitioner, "Solicitor Myers seized every opportunity to improperly inject race into Bennett's resentencing trial. He did so during the prosecution's case in aggravation, while cross examining a defense mitigation witness, and during the State's closing argument." (Dkt. No. 46 at 22.) In his direct appeal, Petitioner did not claim that his right to due process was violated by the State's improper injection of race during its case in aggravation. However, the South Carolina Supreme Court considered Petitioner's claims that Petitioner's due process rights were violated by the Solicitor's comments during cross-examination of a witness and during closing arguments. *Bennett II*, 369 S.C. 219, 632 S.E.2d 281 (2006). In finding that Petitioner's due process rights were not violated based on the Solicitor's comments, the court made reasonable factual findings and reasonably applied clearly established federal law. For all these reasons, the undersigned recommends denying habeas relief as to Ground One.

15

### 1.    "Black Indians" Dream Testimony

During the State's case in aggravation, the State presented the testimony of Shannon Gilbert, a white man that Petitioner assaulted approximately two and a half years before Petitioner murdered Victim. (Dkt. No. 25-9 at 43–53.) On the night of the assault, Gilbert was using a payphone right beside the Pizza Hut where he worked when he noticed a black man standing behind him. (Dkt. No. 25-9 at 44–45.) Gilbert asked the man if he needed to use the phone, and the man nodded yes. (Dkt. No. 25-9 at 44–45.) Gilbert then got off the phone, and that is the last thing he remembers from that night.[5] (Dkt. No. 25-9 at 45.) He woke up two weeks later in a hospital. (Dkt. No. 25-9 at 45.) During his testimony, Gilbert recalled a dream he had while in the hospital, testifying that in the dream "Indians were chasing me trying to kill me, and the thing that I thought was they were black. And later on . . . I've maybe even thought, well, there might have been a link. You know, that I was remembering something about trying to get away from someone." (Dkt. No. 25-9 at 51.) Defense counsel objected to that testimony based on its relevance and also moved to strike. (Dkt. No. 25-9 at 50–51.) The sentencing court overruled the objection and denied the motion to strike. (Dkt. No. 25-9 at 50–51.) Defense counsel later requested a new jury, arguing that because the jury was all-white, the State would "hit this jury with race, race, race. . . . there was no relevance of that testimony except to inflame a white jury who's chased by black Indians." (Dkt. No. 25-9 at 63.) The sentencing

---

[5] Though Gilbert did not remember the assault, the State presented other witnesses who saw it. William Dubose testified that he drove into the Pizza Hut parking lot that night and "observed two white males laying in the parking lot. . . . [and] noticed a large black male standing over one of the victims. He was stomping on the victim's head with his foot." (Dkt. No. 25-9 at 10.) Rhonda Smith testified that while sitting at a table in the Pizza Hut she "saw a black male dragging a white male from the back of the Pizza Hut, and he was dragging him by his hair." (Dkt. No. 25-9 at 21.) She described the black male as "a very big guy." (Dkt. No. 25-9 at 21.) After dragging the white male, the black male "proceeded to kneel down and beat him in the face with his fists and kick and stomp him." (Dkt. No. 25-9 at 21–22.)

The State introduced evidence that Petitioner received a youthful offender sentence for assault and battery of a high and aggravated nature for the Pizza Hut incident. (Dkt. No. 25-9 at 52.)

court denied the motion for a new jury, finding "as I gathered, the witness testified just to what his impressions were of the dream that he had." (Dkt. No. 25-9 at 64.)

On direct appeal, Petitioner challenged whether Gilbert's testimony about his dream was improper victim impact evidence but not whether it was an improper injection of race that violated Petitioner's due process rights. *See Bennett II*, 369 S.C. at 228–33, 632 S.E.2d at 286–89.

Petitioner now asserts that "Gilbert's dream was entirely irrelevant to the events that took place at the Pizza Hut. The dream was presented solely with the aim of playing off the jury's racial prejudices and fears of interracial violence." (Dkt. No. 46 at 31.) This argument was not raised or addressed in Petitioner's direct appeal, but Respondents have not raised a procedural bar regarding the dream testimony. (*See* Dkt. No. 59 at 8.) Rather, Respondents contend that Gilbert's dream testimony was not improperly admitted and, further, that the challenge made to that testimony differs from the challenges made to other statements also raised in Petitioner's Ground One. (Dkt. No. 59 at 19.) Because Respondents have not raised a procedural bar to this particular claim, the undersigned will evaluate the claim's merits. *Gray v. Netherland*, 518 U.S. 152, 165–66 (1996) (noting procedural default is an affirmative defense that is waived if not raised by respondents).

In its order denying Petitioner's motion for a new trial, the sentencing court found that Gilbert's testimony was appropriate character evidence. (Dkt. No. 25-13 at 185.) The court further found:

> The comment of "black Indians" was not elicited by the State, was mentioned only once, was evidence of the Defendant's violent character and the impact of that violence on the victims, was not referred to thereafter by the State, was not a blatant racial reference, and did not prejudice the Defendant.

(Dkt. No. 25-13 at 185–86.) The sentencing court's finding that the "black Indians" testimony was not elicited by the State appears to be incorrect, but that error is not significant, and the remainder of the court's factual findings are supported by the record. "State court trial rulings regarding the admission and exclusion of evidence are cognizable in federal habeas corpus review only to the

extent that they violate specific constitutional provisions or are so egregious as to render the entire

trial fundamentally unfair, thereby violating the Due Process Clause of the Fourteenth Amendment."

*Howard v. Moore*, 131 F.3d 399, 415 n.18 (4th Cir. 1997), *abrogated on other grounds by Miller-El

v. Dretke*, 545 U.S. 231 (2005). Petitioner has not shown that Gilbert's isolated reference to a dream

he had where "black Indians" were chasing him was so egregious as to render Petitioner's trial

fundamentally unfair. Indeed, that testimony was limited, and its impact was minimal in comparison

to the remainder of the State's case in aggravation. Consequently, this particular claim of Petitioner's

Ground One does not warrant federal habeas relief.

2. **"Blonde-Headed Lady" Remark**

In its case in aggravation, the State presented evidence that Petitioner had engaged in a sexual

relationship with a prison guard, Judie Hardee. The Solicitor later asked one of Petitioner's witnesses,

Byron Collins, if he recalled "[t]here was one guard that loved Johnny Bennett and that was Judie

Hardee, you remember her?" (Dkt. No. 25-11 at 500.) Collins responded, "The real big lady?" (Dkt.

No. 25-11 at 500.) And the Solicitor further prompted Collins saying, "Judie Hardee, you remember

her, the blonde-headed lady?" (Dkt. No. 25-11 at 500–01.) Defense counsel moved for a mistrial

based on prosecutorial misconduct and later argued that the Solicitor had mentioned Hardee's hair

color to indicate to the jury that she was a white woman and to inflame their prejudices about

interracial relationships.  (Dkt. No. 25-11 at 501; 25-12 at 35–38.) The trial court denied the motion,

noting that describing Hardee as "blonde" did not necessarily indicate that she was white. (Dkt. No.

25-12 at 37–38.)

On direct appeal the state supreme court also disagreed with Petitioner's argument that the

Solicitor's mention of Petitioner's lover being a "blonde-headed lady" resulted in a denial of due

process:

> In our view, the "blond lady" remark was not made to inflame the passions
> or prejudices of the jury. If the State had sought to make the race of Appellant's
> former lover an issue in this case, we believe they would have elicited evidence to

this effect while examining their witness who testified extensively about the affair. Instead, this comment came while cross-examining a defense witness.

Furthermore, we find that even if this remark was inflammatory, it did not prejudice Appellant. This remark is a far cry from the outrageous and inflammatory evidence and arguments seen in *Nasim*, *Toyota*, *Dial*, and the cases cited by Appellant. The proper inquiry is not whether the Solicitor's remark was undesirable or condemnable, but whether the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In this case, the Solicitor made the "blond lady" comment only once and never referred to Appellant's lover's race again. Furthermore, this case involved a brutal murder, where guilt was clearly established. Accordingly, we find no evidence of prejudice from the "blond lady" remark.

*Bennett II*, 369 S.C. at 231–32, 632 S.E.2d at 288.

The supreme court's factual findings are supported by the record. Additionally, the court reasonably applied federal law in concluding that the Solicitor's question about the "blonde-headed lady" did not deprive Petitioner of the right to due process. "A defendant's due process rights are violated by the prosecution's comments if (1) the prosecution's remarks were improper, and if (2) the improper remarks prejudiced the defendant's substantial rights to such a degree that he was denied a fair trial." *United States v. Clark*, 457 F. App'x 273, 276 (4th Cir. 2011). As the trial court noted, the term "blonde-headed" did not necessarily indicate that Hardee was white, nor did Collins's response confirm that Hardee was white.  However, even assuming that "blonde-headed" indicated Hardee's race, the state supreme court found Petitioner was not prejudiced where the reference to Hardee's race was isolated and the State presented a strong case in aggravation. Petitioner has failed to establish that the state courts made unreasonable factual determinations or unreasonably applied federal law in concluding that Petitioner's right to due process was not violated by the Solicitor's reference to Petitioner's former lover as "the blonde-headed lady." As such, this claim does not warrant habeas relief.

### 3.    "King Kong" and "Caveman" Comparisons

The United States Supreme Court has recognized that in order for the prosecution's closing argument to render a proceeding fundamentally unfair, "it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).

One theme of the Solicitor's closing argument was how dangerous Petitioner was due to his size, his manipulative nature, and his violent history. During his closing arguments, the Solicitor recounted the evidence that the State had presented detailing Petitioner's prior violence and bad behavior. For instance, the Solicitor described the Pizza Hut assault, recalling the evidence that "Johnny was even pulling one of them by his hair. Kind of like an old caveman, dragging him by his hair. And the guy was motionless." (Dkt. No. 25-12 at 85.) The Solicitor also addressed the evidence that Petitioner had presented in his mitigation case. The Solicitor told the jury that Petitioner's more recent behavior as a "model" inmate was just a manipulation—that Petitioner was behaving well to manipulate the guards into testifying for him. (Dkt. No. 25-12 at 99–102.) Then the Solicitor told the jury,

> You give him life, the real Johnny will come back. You give him life and he'll come back out. Meeting him again will be like meeting King Kong on a bad day. Vile Johnny. Mean Johnny. Manipulating Johnny. Murderous Johnny. You give him life, those guards better button up their vests because he's coming back out in force.
>
> Because he's got what he wants. He's got the people to testify, trying to pull the wool[] over his eyes, trying to pull the wool[] over your eyes. Being smart, being intelligent, being manipulative, and being a con man, that's a dangerous combination. And that's an explosive package wrapped up in him, all six-foot-seven, 300 pounds of him. And that's for you to decide.

(Dkt. No. 25-12 at 102.)

Though defense counsel did not make a contemporaneous objection to the Solicitor's remarks, they filed a motion for a new trial on July 27, 2000,[6] arguing that some of the comments made by the Solicitor during his closing argument "were deplorable appeals to racial prejudice." (Dkt. No. 25-13 at 133–45.) The sentencing court denied the motion, finding:

> [T]he analogy to "King Kong," mentioned only one time, was not an appeal to racial prejudice. Rather, it properly described the circumstances surrounding the murder, the character and violent background of the Defendant, his disregard for prison rules and regulations, the actions of the Defendant if given a life sentence, to counteract defense evidence and argument, was an invited response, emphasized the tremendous size and strength of the Defendant, the Defendant did not object to the term, and was used in connection with the very large cardboard figure of the Defendant which was also used without objection. The comment did not infect the trial with unfairness, did not prejudice the Defendant, and was not a denial of due process or fundamental fairness.

(Dkt. No. 25-13 at 189.) And as to the Solicitor's "caveman" comment, the sentencing court found "[t]he comment was properly directed to the characteristics of the Defendant relating to circumstances surrounding a prior ABHAN conviction and jail infraction . . . . I find that comparing Defendant's hair pulling to similar actions attributable to 'an old caveman' does not in any manner inject racial overtones." (Dkt. No. 25-13 at 190.)

The state supreme court, too, found that Petitioner's due process was not violated by the Solicitor's comparisons of Petitioner to "King Kong" and a "caveman":

> [T]he Solicitor's use of the term "King Kong" was not an appeal to the passions or prejudices of the jury. The comment referred to Appellant's immense size, strength, and the destructiveness of his previous crimes. In this case, the trial court properly determined that Appellant's size and strength were probative of the aggravating circumstances of physical torture, which the court charged to the jury. In this regard, the Solicitor's use of the term "King Kong" was not suggestive of a giant black gorilla who abducts a white woman, but rather, descriptive of Appellant's size and strength as they related to his past crimes.

---

[6] In the motion, defense counsel explained that they had not objected because they did not hear the Solicitor's "King Kong" and "caveman" comments due to the configuration of the courtroom. (Dkt. No. 25-13 at 133–34.)

Also, Appellant's mitigation witnesses described him as "a gentle giant," "a big old teddy bear," "the Secretary of Defense," and "the Mediator." The defense used these terms to indicate Appellant was a changed man and not a threat to others. In this regard, the trial court correctly found that "King Kong" was an invited response to Appellant's mitigation evidence.

Finally, the Solicitor's "Caveman" comment was merely descriptive of two of Appellant's past violent incidents. A witness to Appellant's ABHAN testified that she saw Appellant dragging the motionless body of one of the victims across a parking lot by the hair. Additionally, a prison guard testified about an incident where Appellant reached into another inmate's cell and dragged the inmate out by the hair. The Solicitor made this comment while describing how Appellant dragged his victims during these incidents, and, in our view, the comment was not inflammatory.

*Bennett II*, 369 S.C. at 232–33, 632 S.E.2d at 288–89.

Both the sentencing court and the supreme court concluded that the Solicitor's comparisons of Petitioner to "King Kong" and a "caveman" were not improper and that Petitioner's right to due process was not violated by the comparisons. The undersigned cannot say that these conclusions were the result of an unreasonable determination of the facts or an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d).

Under the AEPDA the factual findings made by a state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). In this case, Petitioner has failed to rebut the state courts' findings by clear and convincing evidence. The record reflects that Petitioner was very large, particularly in comparison to Victim, and the Solicitor emphasized that difference throughout the sentencing proceeding, even bringing in cardboard cutouts of the two men to illustrate the disparity. (*See* Dkt. No. 25-9 at 183; 25-10 at 36; 25-11 at 56–64; 25-12 at 76–104; 25-13 at 188–89.) The record also reflects that Petitioner's immense size and strength were factors in his prior crimes, and the Solicitor emphasized that to the jury as well. (*See* Dkt. No. 25-9 at 9–34; 25-11 at 56–64; 25-12 at 76–104.) While the state supreme court recognized that the "King Kong" reference could have "racial connotations," the court ultimately concluded that there was a legitimate, non-racial comparison that could be made between Petitioner and "King Kong" based on the evidence that had been presented by the State. *Cf. Viereck*

*v. United States*, 318 U.S. 236, 247–48 (1943) (indicating in dicta that a conviction might have been "placed . . . in jeopardy" by a prosecutor's "closing remarks to the jury [where] he indulged in an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice"). Similarly, as to the "caveman" comparison, the state courts found that comparison was specifically directed to Petitioner's prior assault where he had dragged a victim by his hair. *See supra* n.5. Thus, the supreme court concluded that the Solicitor did not improperly inject racial issues into the trial. The undersigned cannot say that the state court's conclusion was a result of an unreasonable determination of the facts.

Given the historical significance of comparisons between African-Americans and apes, gorillas, and monkeys (which is well-outlined in the petition (Dkt. No. 46 at 29–35)), there is certainly the potential that a prosecutor's comparison between a black defendant and "King Kong" could be calculated to arouse the passions and prejudices of a jury. *See State v. Blanks*, 479 N.W.2d 601, 603 (Iowa 1991) ("[T]he comparison of a defendant to gorillas, apes, other animals or demeaning descriptions by itself may constitute reversible error."). In this case, where the jury was all-white, (*see* Dkt. No. 25-9 at 63), that potential could be even greater.[7] However, given the context in which the comparison was made in this case (a single reference during a portion of the argument where the Solicitor was emphasizing Petitioner's size, strength, and destructiveness), and given the fact that the comparison was not wholly irrelevant to the evidence that had been presented by the State, the state

---

[7] As detailed in the undersigned's discussion of Ground Two, one of the jurors who decided Petitioner's sentence was racially biased and, thus, may have been particularly susceptible to such racially-charged comments by the Solicitor. It is also interesting to note the Solicitor's approach before the resentencing jury was significantly different from his approach before the original jury. (*See* Dkt. No. 46 at 31 n.1.) For example, the Solicitor did not refer to Petitioner as "King Kong" in his closing argument in the original trial, when proceeding before a mixed race jury; he did do so, however, during the resentencing trial, when proceeding before a jury composed only of white jurors. (Dkt. No. 24-19 at 364–387 (first trial); Dkt. No. 25-12 at 76–104 (retrial); *see also* Dkt. No. 24-15 at 328–29.)

While the undersigned does not believe that the Solicitor's racial references alone warrant habeas relief, the combination of the Solicitor's statements with Juror A.H.'s beliefs and feelings narrowly misses a constitutional violation.

court did not unreasonably apply federal law in concluding that the Solicitor's reference to "King Kong" was not an improper injection of race. In *United States v. Martinez*, 935 F.2d 268 (4th Cir. 1991) (unpublished table decision), the Fourth Circuit concluded a defendant was not prejudiced by the prosecution's comparison of the defendant and the movie character Scarface:

> The government presented at trial, over objection, testimony that Martinez had a "great deal of respect" for the movie character Scarface, a Cuban who worked his way to the top of the Miami cocaine trade in the move *Scarface*. The government argued in closing that Martinez emulated the character in the movie.
>
> . . . .
>
> The relevant legal question is whether the *Scarface* parallel was clearly designed to incite the passions and prejudices of the jury. *United States v. North*, 910 F.2d 843, 894–95 (D.C. Cir. 1990). The argument that the parallel was designed to prod the jury to conclusions based on conjecture and xenophobic biases against Hispanics who reside in Miami, is unpersuasive. Nothing in the record suggests that the argument was designed to arouse racial passions or prejudices. *See United States v. Mack*, 643 F.2d 1119, 1125 (5th Cir. 1981). The character Scarface is Cuban—as is Martinez—but beyond that similarity, we discern no intention by the government to emphasize race to arouse the passion or prejudice of the jury. Rather, the Scarface evidence was relevant to prove Martinez's mental state—that of an enterprising drug kingpin–and was used by the prosecutor to this end.

*Martinez*, 935 F.2d 268, 1991 WL 89932, at *1–2. Clearly, the facts in *Martinez* are not identical to the facts in this case—Martinez was compared to a human movie character while Petitioner was compared to an animal, and there is historical significance to the comparison at issue in the case *sub judice*. Nevertheless, the Fourth Circuit's reasoning is at least instructive and demonstrates that the prosecution can draw comparisons between a fictional character and a defendant without trying to arouse racial passions and prejudices. In this case, the South Carolina Supreme Court reasoned, similarly to the *Martinez* court, that the comparison was relevant and was merely descriptive of characteristics of Petitioner—specifically his size, strength, and destructiveness—and was not designed to arouse the passions and prejudices of the jury. In light of the record, the undersigned cannot say that it was unreasonable for the state court to draw that conclusion. Accordingly, Petitioner is not entitled to relief on this claim.

**B.**    **Ground Two**

Petitioner asserts in Ground Two that his right to an impartial jury at his resentencing trial was violated by the seating of a racially biased juror, Juror A.H. (Dkt. No. 46 at 36.)  The record reflects that during an interview with PCR counsel in 2007, Juror A.H. was asked, "why did you think Mr. Bennett had killed the victim?" (Dkt. No. 25-16 at 18, 25-19 at 71.) And Juror A.H. admitted to responding, "because he was just a dumb nigger" or "some words like that . . . ." (Dkt. No. 25-16 at 18, 25-19 at 71.) The PCR court found Juror A.H.'s testimony to be credible. (Dkt. No. 25-19 at 45.) Nevertheless, the PCR court denied relief on Petitioner's impartial jury claim, finding Petitioner had failed to meet his burden of proof that Juror A.H. was actually biased at the time of Petitioner's resentencing proceeding in 2000. (Dkt. No. 25-19 at 66–76.) Petitioner now claims

> the state PCR court denied relief by drawing three factually unsupportable and legally irrelevant conclusions: (1) [A.H.]'s bias only came into existence sometime after Bennett's trial, app. 3790; (2) Bennett did not establish that [A.H.] believed that "African-Americans were inferior to Whites," app. 3792; and, (3) [A.H.]'s racial prejudice was not relevant since the victim was also black.  App. 3794.

(Dkt. No. 46 at 36–37 (footnote omitted).)  The undersigned agrees that the PCR court made unreasonable findings of fact in denying this claim and that the PCR court's decision is contrary to clearly established federal law. Accordingly, the undersigned recommends granting habeas relief to Petitioner as to Ground Two.

The AEDPA creates a presumption that factual determinations by the state court are correct, and a habeas petitioner has the burden of rebutting that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Fourth Circuit has held "that '[t]o secure habeas relief, petitioner must demonstrate that a state court's finding . . . was incorrect by clear and convincing evidence, and that the corresponding factual determination was "objectively unreasonable" in light of the record before the court.'" *Merzbacher v. Shearin*, 706 F.3d 356, 364 (4th Cir. 2013).  In reviewing a state court's factual findings, "'federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'"

*Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). And in order "for a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear." *Id.* As to when a state court's factual determination is "unreasonable," that is "no doubt difficult to define[,]" but "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (internal quotations and citations omitted). Indeed, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).

Despite the exceedingly deferential standard that this Court must use in reviewing the PCR court's adjudication of this issue, the undersigned finds that the PCR court's determination that Petitioner failed to prove that Juror A.H. was actually biased at the time of Petitioner's resentencing proceeding to be objectively unreasonable.

### 1.    PCR Evidentiary Hearing and Findings of Fact

Petitioner called Juror A.H. as a witness during the PCR evidentiary hearing. (Dkt. No. 25-16 at 16–29.) Juror A.H. testified that PCR Counsel Lominack approached him at his house in 2007 with some questions about his experience as a juror at Petitioner's 2000 resentencing proceeding. (Dkt. No. 25-16 at 16–17.) During the evidentiary hearing, Counsel Lominack questioned Juror A.H. about a particular statement he made during that informal interview:

> Q.    . . . And do you recall me asking you the question, indicating that this was a strange crime and why did you think that Mr. Bennett had killed the victim?
>
> A.    I don't recollect the exact words, but I remember, yes, I guess.
>
> . . . .
>
> Q.    Do you recall what your answer was?
>
> A.    Yes.

Q.    And what was your answer to that question?

A.    I don't—I don't really recall which question that I answered what you're going to make me say—I don't recall.

Q.    Okay. Do you recall ever saying, "because he was just a dumb nigger"?

A.    Some words like that, yes.

Q.    Okay. Okay. Would you like to change any of the words that I just said?

A.    Yeah. You know, I apologize for saying that one word, but after going through that thing for an entire week and all the evidence piling up against him, that was just the way I felt about it.

Q.    All right. And I don't want to put words in your mouth. You're not—I didn't misstate what you said; right?

A.    No, I said that.

Q.    You're not happy that you said it.

A.    No, I'm not.

(Dkt. No. 25-16 at 18–19.)

On cross-examination, Juror A.H. testified that neither he nor the other jurors ever used any kind of racial epithet during the course of deliberations, that neither he nor the other jurors ever expressed that Petitioner deserved death because he was black, and that the fact that Petitioner was black did not play any part in his decision. (Dkt. No. 25-16 at 22–24.) According to Juror A.H., "it wouldn't have mattered what color the person was. The crime, the evidence, everything was there, and the way we all decided was on what all we heard and the evidence that was before us." (Dkt. No. 25-16 at 23.) Juror A.H. further testified that he did not think that Blacks are morally inferior to Whites, nor did he think that a black person charged with murder deserves to be punished more harshly. (Dkt. No. 25-16 at 24.) He stated, "I'm not prejudiced. You know, like I say, I said the wrong word. I shouldn't have said it." (Dkt. No. 25-16 at 24.)

During redirect examination Counsel Lominack attempted to pin down when it was that Juror A.H. felt that Petitioner was "just a dumb nigger," but Juror A.H. did not specify; rather, he replied, "I mean, that statement is just wrong. You know, I said it. It was a mistake. You know, I shouldn't have said that but, you know, I—to me he was not a good person for what he did with no remorse, and that's how I felt." (Dkt. No. 25-16 at 25.) Juror A.H. further testified that he "felt wrong about saying the n. word" and "it was a bad choice of words." (Dkt. No. 25-16 at 28.) However, Juror A.H. admitted that that was not the first time he had used that word. (Dkt. No. 25-16 at 28.) He had used the word to describe an African-American before, and he had attached the word "dumb" right next to it to describe an African-American before. (Dkt. No. 25-16 at 29.) In response to a question about whether he had ever used that word to describe an African-American, Juror A.H. testified, "I've used it to describe one of my best friends. It's just a word." (Dkt. No. 25-16 at 28.)

The PCR judge concluded that Petitioner "failed to establish that Juror [A.H.] was actually biased when he was a member of the jury in [Petitioner's] case in 2000[,]" explaining:

> [A.H.]'s answer to that question, while deplorable and racially insensitive, is not sufficient evidence to establish that he was actually biased against Applicant during the resentencing hearing some seven years earlier. His testimony establishes only how Juror [A.H.] felt about the Applicant's conduct when asked in June 2007. Nothing in Juror [A.H.]'s testimony at the PCR hearing establishes that he was biased against Applicant at the time of trial because of Applicant's race. Contrary to Applicant's assertions, it is unclear from [A.H.]'s testimony when he came to the conclusion that Applicant was a racial epithet. When asked by Applicant's counsel if he wanted to change any of the words said, Juror [A.H.]'s testimony indicates that in reflecting upon the week of the trial and the evidence presented, this was how he felt about Applicant. 5/27/08 PCR Tr. p. 9-10. It appears that his reflection was how he felt at the time he was speaking with Applicant's counsel in 2007, not at the time of the sentencing trial in 2000. Juror [A.H.]'s testimony on redirect was similarly vague in regards to the timing of his characterization of Applicant. When asked if that was how [A.H.] felt at the time of the re-sentencing trial, [A.H.] responded that it was wrong for him to make the statement. 5/27/08 PCR Tr. p. 16. He further testified that Applicant "was not a good person for what he did, with no remorse, and that's how I felt." 5/27/08 PCR Tr. p. 16. Again, it appears that Juror [A.H.] is discussing his thoughts at the time the statement was made in 2007, not his thoughts during the re-sentencing trial.

(Dkt. No. 25-19 at 71–72.) The PCR court noted that Petitioner had presented no other probative evidence to establish that Juror A.H. was racially biased at the time of the resentencing proceeding but had "relie[d] solely on the fact that the juror used a racial epithet in 2007 to establish that the juror was racially biased in 2000." (Dkt. No. 25-19 at 72.) The PCR judge found Juror A.H.'s testimony to be credible, particularly noting Juror A.H.'s testimony that race had nothing to do with his decision and that he did not believe that Blacks are inferior to Whites. (Dkt. No. 25-19 at 72.) According to the PCR court, "[A.H.] admitted that he made the statement alleged by Applicant. He clearly acknowledged that it was a poor choice of words, and he expressed that it was not reflective of his view on race or the Applicant. Applicant offers no probative evidence to establish that [A.H.]'s testimony was untrue." (Dkt. No. 25-19 at 72–73.)

The PCR court went on to discuss the Eleventh Circuit's opinion in *Dobbs v. Zant*, 963 F.2d 1403 (11th Cir. 1991), which the PCR court said supported its finding in Petitioner's case. (Dkt. No. 25-19 at 73–75.) The PCR court found no prejudice since

> even if Applicant can show that Juror [A.H.] uttered the racial epithet in reference to Applicant some seven years after the sentencing proceeding, Applicant did not show that racial prejudice actually affected the jury's decision because even if Juror [A.H.] possessed some racial prejudice, he cannot show that [A.H.] was influenced by prejudices that would make him favor the death penalty for a black person who murdered another black person or that he would favor the death penalty for a black person charged with murder.

(Dkt. No. 25-19 at 75.)

### 2. Constitutional Right to an Impartial Jury

Regarding a capital defendant's right to an impartial jury, the Fourth Circuit has said,

> The Sixth Amendment, which is applicable to the states through the Fourteenth Amendment, *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961), requires that a defendant be accorded an impartial jury in all criminal prosecutions. Furthermore, as we observed in *Jones v. Cooper*, "'[d]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment.'" 311 F.3d 306, 310 (4th Cir. 2001) (quoting *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)). Put simply, if "even one [partial] juror is

29

empaneled" and the death sentence is imposed, "the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 728.

*Conner v. Polk*, 407 F.3d 198, 205 (4th Cir. 2005). "'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.'" *Dennis v. United States*, 339 U.S. 162, 172 (1950) (quoting *United States v. Wood*, 299 U.S. 123, 145–46 (1936)). Despite the absence of any definitive test or formula to determine partiality, it is well-recognized that there are "narrowly specified, provable and legally cognizable bas[es] of partiality[,]" *Swain v. Alabama*, 380 U.S. 202, 220 (1965), *overruled by Batson v. Kentucky*, 476 U.S. 79 (1986)—one of which is actual bias. "Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire partiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997).

### 3.    Unreasonable Determination of the Facts

The United States Supreme Court has held that "juror bias merits treatment as a 'factual issue' within the meaning of § 2254(d) notwithstanding the intimate connection between such determinations and the constitutional guarantee of an impartial jury." *Miller v. Fenton*, 474 U.S. 104, 115 (1985). Juror bias determinations made by trial courts are entitled to special deference, *Patton v. Yount*, 467 U.S. 1025, 1038 (1984), since the "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record[,]" *Wainwright v. Witt*, 469 U.S. 412, 429 (1985). As the Supreme Court has long recognized,

> [T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.

*Reynolds v. United States*, 98 U.S. 145, 156–57 (1878).

In light of this special deference, "the question is whether there is fair support in the record for the state courts' conclusion that the jurors here would be impartial." *Patton*, 467 U.S. at 1038. In

this case, there is not fair support for that conclusion. Indeed, here, the undersigned need not redetermine the PCR court's credibility findings in order to recommend that the instant petition be granted under 28 U.S.C. § 2254(d)(2). Rather, it is the PCR court's strained interpretation of the plain wording of the testimony, along with the PCR court's forced reconciliation of incompatible evidence, that compels the undersigned to find that the PCR court's decision was based on an unreasonable determination of the facts in light of what was presented at the PCR evidentiary hearing.

> **a.    The PCR court made an unreasonable determination of the facts when it concluded that Juror A.H. was discussing how he felt in 2007, rather than 2000, when he called Petitioner "just a dumb nigger."**

The PCR court's finding that Juror A.H.'s statement that Petitioner was "just a dumb nigger" merely reflected his feelings about Petitioner in 2007, and did not reflect how he felt about Petitioner at the time of the sentencing proceeding, was an unreasonable determination of the facts. Based on the PCR court's findings, Counsel Lominack and Juror A.H. had the following exchange in 2007:

Counsel Lominack:    Why did you think Mr. Bennett had killed the victim?

Juror A.H.:            Because he was just a dumb nigger.

(*See* Dkt. No. 25-19 at 71.) Juror A.H.'s response to Counsel Lominack's question was clearly indicative of his thoughts at the time of the sentencing proceeding in 2000. The words themselves dictate that conclusion, and the fact that Counsel Lominack's question was posed during an informal interview about Juror A.H.'s experience as a juror in Petitioner's case (Dkt. No. 25-16 at 17–18) further supports that conclusion. Had Juror A.H. been asked "why **do** you think that Mr. Bennett killed the victim," and he responded "because he was just a dumb nigger," then the PCR court's findings might have been reasonable. But the PCR court found that the question asked was "why **did** you think Mr. Bennett had killed the victim[,]" and the answer given was "because he was just a dumb nigger" or some words to that effect. (Dkt. No. 25-19 at 71.) The at-issue exchange occurred in 2007, and both Counsel Lominack and Juror A.H. spoke in the past tense during that exchange. It was unreasonable for the PCR court to conclude that this exchange, which occurred in 2007 in the

past tense, referred to the time frame of that very exchange (i.e., the present). It was unreasonable for the PCR court to draw a different conclusion other than that Juror A.H.'s use of "just a dumb nigger" described what he thought of Petitioner in 2000 at the time of the sentencing proceeding. *Cf. Credell v. Bodison*, 818 F. Supp. 2d 928, 937 (D.S.C. 2011) (finding a state PCR court's factual findings were unreasonable where the state court employed flawed reasoning in concluding that trial counsel's actions were not deficient).

Despite the clear import of the actual conversation between Counsel Lominack and Juror A.H., the PCR court found it "unclear from [A.H.]'s testimony when he came to the conclusion that Applicant was a racial epithet." (Dkt. No. 25-19 at 71.) Nevertheless, the PCR court ultimately decided that Juror A.H.'s response—"because he was just a dumb nigger"—showed what Juror A.H. thought in 2007, not in 2000. (Dkt. No. 25-19 at 71.) The PCR court cited to two portions of Juror A.H.'s testimony to explain that conclusion. The court first cited the following portion of Juror A.H.'s direct examination:

> Q.    . . . Would you like to change any of the words that I just said?
>
> A.    Yeah. You know, I apologize for saying that one word, but after going through that thing for an entire week and all the evidence piling up against him, that was just the way I felt about it.

(*See* Dkt. No. 25-19 at 71 (citing Dkt. No. 25-16 at 18–19).) From that, the PCR court determined, "[i]t appears that his reflection was how he felt at the time he was speaking with Applicant's counsel in 2007, not at the time of the sentencing trial in 2000." (Dkt. No. 25-19 at 71.) Then the court cited a portion of Juror A.H.'s testimony on redirect:

> Q.    Mr. [A.H.], on direct . . . you stated when I was asking you questions that this is how you felt in terms of your characterization of Mr. Bennett at the time of the resentencing after you had to hear the evidence; right?
>
> A.    What—felt what?
>
> Q.    That he was just a dumb nigger.

A.     I mean, that statement is just wrong. You know, I said it. It was a mistake. You know, I shouldn't have said that but, you know, I—to me he was not a good person for what he did with no remorse, and that's how I felt.

(*See* Dkt. No. 25-19 at 71–72 (citing Dkt. No. 25-16 at 25).) According to the PCR court, from that testimony "it appears that Juror [A.H.] is discussing his thoughts at the time the statement was made in 2007, not his thoughts during the re-sentencing trial." (Dkt. No. 25-19 at 72.)

The undersigned disagrees with the conclusions drawn by the PCR court from those portions of testimony—namely, that it "appears" that Juror A.H. was only discussing his thoughts and feelings in 2007. At best, Juror A.H.'s additional testimony is ambiguous as to whether, at the time of his testimony in 2008, he was discussing how he "felt" in 2007 or 2000. Juror A.H.'s own words only convey that he "felt" that Petitioner "was just a dumb nigger" sometime in the past after having gone through "that thing for an entire week"[8] and after seeing the evidence "pil[e] up against" Petitioner. Such ambiguous testimony is insufficient to overcome what is manifestly clear from the words spoken during Counsel Lominack's informal interview with Juror A.H. in 2007—Juror A.H. believed, at the time of the sentencing proceeding in 2000, that Petitioner killed the victim because Petitioner "was just a dumb nigger." The PCR court's finding that Petitioner did not meet his burden on this issue is unreasonable based on the credible evidence presented.

        **b.**    **The PCR court made an unreasonable determination of the facts when it concluded that the evidence was insufficient to prove that Juror A.H. was partial as the result of a racial bias against Petitioner.**

Based on a strict reading of the PCR court's order, the court did not find that Juror A.H. was not racially biased in 2000. The court found that Petitioner did not present sufficient evidence to establish that Juror A.H. was racially biased in 2000. In coming to that conclusion, the PCR court

---

[8]It is unclear whether "that thing" was just the presentation of the evidence or whether it was the entire proceeding, including jury deliberations. The record reflects that voir dire was conducted over two days (July 11 & 12, 2000) and that the presentation of evidence spanned five days (July 12–16, 2000). The jury deliberated and rendered their verdict on July 16, 2000. (*See* Dkt. No. 25-5 at 11–22.)

found credible Juror A.H.'s testimony that his decision was based solely upon the evidence presented at trial, that race had nothing to do with his decision, that he did not believe Blacks are inferior to Whites, and that his words "just a dumb nigger" were not reflective of his views on race or Petitioner. (Dkt. No. 25-19 at 72–73.) The PCR court stated that Petitioner had

> offer[ed] no probative evidence to establish that [A.H.]'s testimony was untrue. There was no testimony or probative evidence presented that established [A.H.] viewed African-Americans as inferior to Whites, or that [A.H.] did not properly consider and weigh all of the evidence presented at Applicant's trial in making his finding as a juror.

(Dkt. No. 25-19 at 73.)

Of course, these findings by the PCR court disregard the undisputed evidence that when Counsel Lominack asked Juror A.H. why he thought Petitioner killed the victim, Juror A.H. responded, "because he was just a dumb nigger." The PCR court described Juror A.H.'s use of the word "nigger" as "deplorable and racially insensitive." (Dkt. No. 25-19 at 71.) The Fourth Circuit has described that particular racial epithet as "[f]ar more than a 'mere offensive utterance[;]' the word 'nigger' is pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). The Ninth Circuit has expressed "considerable difficulty accepting . . . that, at this time in our history, people who use the word 'nigger' are not racially biased," *United States v. Henley*, 238 F.3d 1111, 1121 (9th Cir. 2001), a statement with which the undersigned is in full agreement. By indicating that Petitioner "was just a dumb nigger," not only did Juror A.H. exhibit his strong racial bias, but he also showed that his racial bias actually impacted his thoughts on

Petitioner.[9] The PCR court's finding that Petitioner failed to show that Juror A.H. was partial as the result of an actual bias against Petitioner is unreasonable in light of the evidence presented.

The PCR court's unreasonable factual findings stem from its misinterpretation of the evidence. But in determining that Juror A.H. was not partial, the PCR court additionally found the remainder of Juror A.H.'s testimony to be credible. The undersigned believes that certain parts of Juror A.H.'s testimony cannot be reconciled—for example, that Juror A.H. believed Petitioner to be "just a dumb nigger" but also that he did not view Blacks as inferior to Whites and that he properly considered and weighed all of the evidence in making his finding as a juror. As discussed above, Juror A.H.'s racial bias clearly impacted his opinion of Petitioner despite his claims that it did not and that he was not prejudiced. *See United States v. Heller*, 785 F.2d 1524, 1527 (11th Cir. 1986) ("A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires."). The undersigned acknowledges that "[d]etermining whether a juror is biased . . . is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it." *Smith v. Phillips*, 455 U.S. 209, 221–22 (1982) (O'Connor, J., concurring). And Juror A.H. obviously seemed sincere to the PCR court when he

---

[9] This case is distinguishable from *Dobbs v. Zant*, 963 F.2d 1403 (11th Cir. 1991), which the PCR court relied upon in its order. In *Dobbs*, the Eleventh Circuit found a petitioner had failed to demonstrate "a constitutionally unacceptable risk existed that racial prejudice affected his sentencing[,]" *id.* at 1408, despite finding that "certain of the jurors' statements revealed racial prejudice," *id.* at 1407. The level of racial prejudice shown by the jurors in that case is described in detail in the district court's order. *Dobbs v. Zant*, 720 F. Supp. 1566, 1575–76 (1989). For example,

> Several of the jurors referred to blacks as "colored," and none of them said whether it had negative connotations. Most indicated the word "nigger" was insulting and disrespectful, although two jurors admitted using the word on occasion. One of those jurors said he uses the word when he intends to be negative, and the other juror said she uses the word when she is with blacks who use the word themselves, and that the word is not negative anymore.

*Dobbs*, 720 F. Supp. at 1576. It does not appear that any of the jurors used the word "nigger" when describing the petitioner in that case. *Id.* at 1575–76.

asserted that he did not consider race in deciding Petitioner's sentence. Whether that sincerity was an attempt to conceal his racial bias against Petitioner or whether Juror A.H. was simply unaware of it, the PCR court should have seen that Juror A.H.'s expressed belief that Petitioner "was just a dumb nigger" belied his seemingly-earnest protestations that he was not prejudiced.

Other parts of Juror A.H.'s testimony were similarly incompatible. For instance, in the course of admitting that he had used the word "nigger" to describe an African-American before, Juror A.H. stated, "I've used it to describe one of my best friends. It's just a word." (Dkt. No. 25-16 at 28.) There were no follow up questions on that rather bizarre testimony. Shortly before asserting that "nigger" was "just a word," Juror A.H. testified, "I felt wrong about saying the n. word. I shouldn't have said that." (Dkt. No. 25-16 at 28.) Juror A.H. did more than refer to Petitioner as a "nigger"–Juror A.H. referred to Petitioner as "just a dumb nigger." Given the foregoing juxtaposition and phrasing, Juror A.H.'s reference was clearly meant to be a derogatory one.

It was unreasonable for the PCR court to try and reconcile Juror A.H.'s antithetical testimony. Thus, the PCR court's ultimate conclusion that Petitioner failed to meet its burden as to Juror A.H.'s partiality was based on an unreasonable determination of the facts. The credible evidence before the PCR court of Juror A.H.'s racial bias against Petitioner requires the inference that Juror A.H. could not act with entire partiality in deciding Petitioner's sentence.

### 4.    Decision Contrary to Clearly Established Federal Law

While the PCR court's order reflects that the court had a firm grasp on a defendant's constitutional right to an impartial jury, and the court relied heavily on federal case law in its order, the adjudication by the PCR court resulted in a decision that was contrary to clearly established federal law as decided by the United States Supreme Court. *See* 28 U.S.C. § 2254 (d).

The PCR court recognized that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it . . . [,]" (Dkt. No. 25-19 at 69–70 (quoting *Smith v. Phillips*, 455

U.S. 209, 217 (1982)).) And the court specifically noted federal precedent that "[j]urors are presumed to be impartial, absent indications to the contrary[,]" (Dkt. No. 25-19 at 69 (citing *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987))), but that "'[i]f an impaneled juror was actually biased, the conviction must be set aside[,]" (Dkt. No. 25-19 at 70 (quoting *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2000))).

Nevertheless, because the PCR court found there to be insufficient evidence that, at the time of the resentencing proceeding, Juror A.H. was partial based on an actual bias toward Petitioner (an objectively unreasonable factual finding), the PCR court concluded that Petitioner's right to an impartial jury was not violated. As outlined above, using the PCR court's own credibility findings, the evidence established that Juror A.H. had an actual bias against Petitioner at the time of the resentencing proceeding. Yet the PCR court found as follows:

> [E]ven if Applicant can show that Juror [A.H.] uttered the racial epithet in reference to Applicant some seven years after the sentencing proceeding, Applicant did not show that racial prejudice actually affected the jury's decision because even if Juror [A.H.] possessed some racial prejudice, he cannot show that [A.H.] was influenced by prejudices that would make him favor the death penalty for a black person who murdered another black person or that he would favor the death penalty for a black person charged with murder.

(Dkt. No. 25-19 at 75.) The PCR court's analysis of the prejudice to Petitioner missed the mark. The PCR court focused on whether Juror A.H.'s prejudices would have influenced him to favor the death penalty for a black-on-black murder or, in general, for a black person charged with murder. But those issues are beside the point—the evidence showed that Juror A.H.'s bias actually influenced his opinion *of Petitioner* at the time of the resentencing proceeding. This error cannot be harmless. *See Rose v. Clark*, 478 U.S. 570, 577 (1986) ("Harmless-error analysis . . . presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury.").

### 5.    Recommendation to Grant Habeas Relief

The evidence presented to the PCR court, which that court found credible, established that Juror A.H. harbored a racial bias at the time of the 2000 sentencing proceeding and that his racial bias impacted his opinion of Petitioner at the time of the resentencing trial. To interpret the evidence otherwise is untenable. Furthermore, with such an actual bias against Petitioner, Juror A.H. could not have been found capable and willing to decide the case solely on the evidence before him. "'Some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.' . . . The right to an impartial adjudicator, be it judge or jury, is such a right." *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)). Petitioner's constitutional right to an impartial jury was violated, and the PCR court's determination otherwise was based on objectively unreasonable findings of fact and is contrary to clearly established federal law. For these reasons, the undersigned recommends granting habeas relief as to Ground Two.

## C.    Ground Three

In Ground Three, Petitioner asserts that trial counsel were ineffective for failing to challenge the Solicitor's decision to seek the death penalty as improperly based on race. Specifically, Petitioner claims the Solicitor's "decision in this black-victim case appeared to be based on race—rather than in the interest of justice—in an effort to give the impression that the charging decisions were unbiased." (Dkt. No. 26 at 45.) Both Petitioner and Respondents agree that this claim is procedurally defaulted, but Petitioner asserts that because PCR counsel was ineffective for failing to raise this claim in state court, the procedural default should be excused under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

Pursuant to *Martinez*, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1315. To establish that PCR counsel provided ineffective

assistance of counsel, Petitioner must show that: (1) his counsel's performance "fell below an objective standard of reasonableness"; and (2) he was prejudiced by his counsel's deficient performance. *Strickland*, 466 U.S. 668, 687–88 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013) ("To establish ineffective assistance of his initial state habeas counsel, [Petitioner] must show both that habeas counsel's performance . . . was deficient and that he was prejudiced by the deficient performance—that is, there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application."); *Foley v. White*, No. 6:00-CV-552-DCR-REW, 2012 WL 6965070, at *9 (E.D. Ky. Nov. 15, 2012), adopted at 2013 WL 375185 (E.D. Ky. Jan. 30, 2013) ("In the context of *Martinez*, a demonstration of prejudice would require [Petitioner] to show that, but for post-conviction counsel's errors, there is a reasonable probability he 'would have received relief on a claim of ineffective assistance of trial counsel in state court.'" (quoting *Leavitt v. Arave*, No. 1:93-cv-0024-BLW, 2012 WL 1995091, at *10 (D. Idaho June 1, 2012))); *Horonzy v. Smith*, No. 1:11-cv-00235-EJL, 2012 WL 4017927, at *6 (D. Idaho Sept. 12, 2012) ("The application of the *Strickland* test in this instance means that Petitioner is required to show that counsel's representation during the post-conviction proceeding was objectively unreasonable, and that, but for his errors, there is a reasonable probability that Petitioner would have received relief on a claim of ineffective assistance of trial counsel in the state post-conviction matter. This standard is a high one.").

The undersigned recommends granting summary judgment to Respondents as to Ground Three. Petitioner has not shown a reasonable probability that he would have received relief on this ineffective assistance claim had PCR counsel raised it. Although Petitioner speculates that the

Solicitor's decision to seek death in Petitioner's case was race-based and that trial counsel should have challenged that decision as such, Petitioner has failed to demonstrate that this underlying claim has merit.

"In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (citing *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)). Courts apply a presumption of regularity to such prosecutorial decisions; "'in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Nevertheless, while "prosecutorial discretion is broad, it is not 'unfettered.'" *Wayte*, 470 U.S. at 608. For example, prosecutors cannot engage in selective prosecution—that is, making a decision on whether to prosecute "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 464 (internal citations omitted). The Equal Protection Clause of the Fourteenth Amendment prohibits prosecution decisions by state prosecutors on such bases.[10] U.S. Const. amend. XIV, § 1. In order to successfully challenge a prosecution decision, for example, on the basis of race, a defendant must demonstrate that the "prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.' To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). And "discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part

---

[10] Petitioner and Respondents reference the equal protection component of the Due Process Clause. In order to properly challenge the decision to seek death by a state solicitor, trial counsel would have had to argue that the decision violated the Equal Protection Clause of the Fourteenth Amendment, as opposed to the equal protection component of the Due Process Clause of the Fifth Amendment. *Cf. McCleskey v. Kemp*, 481 U.S. 279, 291–99 (1987) (denying a claim that the Georgia capital punishment statute violated the Equal Protection Clause of the Fourteenth Amendment). Regardless of whether proceeding under the Due Process Clause of the Fifth Amendment or the Fourteenth Amendment, the analysis is the same.

because of, not merely in spite of, its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (internal citations and quotations omitted).

Petitioner has failed to establish either discriminatory effect or discriminatory purpose. In an attempt to establish that the Solicitor sought the death penalty in Petitioner's case because Victim was Black, Petitioner provided a table listing the races of the victims and of the defendants in Solicitor Myers's death penalty cases from 1977 to 2000. According to the information provided by Petitioner, during that time period, Solicitor Myers sought the death penalty against seven black defendants who killed white victims (four of which were retried as death penalty cases), against two black defendants who killed black victims (one of which was retried as a death penalty case)[11], against one white defendant who killed a black victim, and against eighteen white defendants who killed white victims (four of which were retried as death penalty cases). The undersigned cannot conclude from these statistics that the Solicitor sought the death penalty in Petitioner's case because Benton Smith was African-American.  Indeed, while the number of white victims far surpasses the number of black victims in capital cases in Lexington County, the number of white defendants also far surpasses the number of black defendants in capital cases in Lexington County. The statistics provided by Petitioner are insufficient to establish that the Solicitor sought the death penalty in Petitioner's case because of Victim's race. *McCleskey*, 481 U.S. at 297 ("Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused.").

In any event, to prevail on his selective prosecution claim, Petitioner would have to show that the Solicitor did not seek the death penalty for similarly situated defendants whose victims were white. Thus, statistics from cases where the Solicitor sought death are of limited value, but

---

[11] Petitioner's case <u>was</u> the retrial for a black defendant who killed a black victim.

information from cases where the Solicitor declined to seek death is of much greater import. To that

end, Petitioner compared his case to that of Calen J. Radwill. According to Petitioner,

> In 1995, Calen J. Radwill was charged with the kidnapping and murder of 15 year old Brandon Vinson. *See State v. Radwill*, No. 99-GS-32-3670. Radwill abducted Vinson from the Winn Dixie grocery store where Vinson worked. Vinson's body was discovered three days later in an abandoned chicken coop. He had been stabbed approximately 70 times. Both Radwill and Vinson were white. Despite occurring around the time of Bennett's trial for a similar crime, the solicitor did not seek the death penalty against Radwill.

(Dkt. No. 46 at 45–46.) Because Petitioner did not provide a cite for this information, it is unclear

where his counsel found the details of Radwill's crime. However, it appears that Petitioner incorrectly

asserted a crucial detail of Radwill's case by claiming that Solicitor Myers did not seek the death

penalty against Radwill. Respondents submitted to this Court a document filed by the Solicitor in

Radwill's case in 2004, which shows that the Solicitor did seek the death penalty against Radwill.

(*See* Dkt. No. 60-1.) Petitioner's reliance on Radwill's case to show that the Solicitor did not seek the

death penalty against a similarly situated defendant whose victim was white is clearly misplaced.[12]

As explained above, Petitioner has failed to establish that the Solicitor's decision to seek death

in Petitioner's case was race-based.[13] As the selective prosecution claim appears to have no merit,

there is no reason to believe that trial counsel were ineffective for failing to challenge the Solicitor's

decision to seek death on that basis. Petitioner has not demonstrated that "the underlying

ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must

demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318. Accordingly, the

---

[12] Respondents additionally indicated that Radwill was seventeen at the time of his crimes, which further distinguishes his case from Petitioner's.

[13] Though the undersigned granted Petitioner's request for additional discovery to develop this ground (*see* Dkt. Nos. 78 & 91), Petitioner declined to supplement his petition after reviewing the discovery (*see* Dkt. No. 94). The undersigned sees no reason to grant an evidentiary hearing on this issue when the information provided to this Court thus far is insufficient to make a prima facie case of ineffective assistance of counsel, and it does not appear that there are any factual disputes to resolve on the issues raised in Petitioner's Ground Three.

undersigned recommends concluding that the procedural default precludes federal habeas review of Petitioner's Ground Three. *See Martinez*, 132 S. Ct. at 1319.

### D.    Ground Four

Petitioner contends in Ground Four that trial counsel were ineffective for failing to ask potential jurors about their racial attitudes during voir dire. In denying and dismissing this same claim, the PCR court found that Petitioner failed to establish either deficient performance or prejudice. Because the PCR court's determination was not based on unreasonable factual findings or the result of an unreasonable application of federal law, the undersigned recommends granting summary judgment to Respondents as to this ground.

The record reflects that initially trial counsel did not request to question the potential jurors about their views on race. Following voir dire, a jury was seated that included eleven white jurors, one black juror, and two alternates. (*See* Dkt. No. 25-8 at 145–51.) However, the single black juror was removed from the jury after he informed the trial court that he knew some of Benton Smith's family members "pretty well" and that he did not "feel that [he] could just sit and be impartial." (Dkt. No. 25-8 at 137–48.) At that point, trial counsel requested to ask the "remaining jurors [about] their racial attitudes" to see if there was "some type of motion [trial counsel] might make to strike some of those jurors if they, in fact, exhibit[ed] racism which may impact upon the verdict . . . ." (Dkt. No. 25-8 at 152.) The trial court denied that motion. (Dkt. No. 25-8 at 153.)

During the PCR evidentiary hearing, both trial counsel testified that they were concerned about racial issues in Petitioner's case. (Dkt. No. 25-16 at 44, 124.) Additionally, both were aware that the State planned to introduce evidence about the Pizza Hut attack, in which Petitioner had assaulted two white men. (Dkt. No. 25-16 at 38–39, 103.) But according to Counsel Floyd, they had no strategic reason for failing to request voir dire on potential jurors' racial attitudes. (Dkt. No. 25-16 at 45.) Counsel Floyd testified that he was aware that he could question potential jurors about their

beliefs on race, but he indicated that was a very delicate line of inquiry. (Dkt. No. 25-16 at 53.) Counsel Floyd explained, "[F]irst of all, I'm not sure people are always honest about that question. You also would have to be careful not to offend people with the question. . . . And you, of course, don't want to interject it if it's not present." (Dkt. No. 25-16 at 53–54.)

Counsel Young also testified that he had no tactical reason not to voir dire potential jurors about race. (Dkt. No. 25-16 at 124.) He also told the PCR court that he knew he could have requested to question the potential jurors about their views on race, but he "didn't make it a priority because of the fact that we had a case that had a black victim and a black defendant." (Dkt. No. 25-16 at 105.)

In its order, the PCR court pointed out that a court's "review of counsel's performance in voir dire is 'highly deferential;' and any error in conducting it must be egregious and obvious." (Dkt. No. 25-19 at 169 (citing *Yeatts v. Angelone*, 166 F.3d 255, 265 (4th Cir. 1999)). The PCR court found that trial counsel was well aware of the potential for racial prejudice but that Petitioner's case did not present "the typical situation where questions about jurors' views on race are asked because Applicant, the victim and almost half of the witnesses were African-American." (Dkt. No. 25-19 at 170.) Based on its review of the record and trial counsel's testimony, the PCR concluded that trial counsel's performance was not deficient. (Dkt. No. 25-19 at 169–70.)

The record fairly supports the PCR court's factual findings. Indeed, at the sentencing proceeding when Counsel Floyd asked the trial court for permission to conduct additional voir dire on the seated jurors, he explained why they had not explored the jurors' racial attitudes earlier:

> [W]e did not explore their racial attitudes because we knew there were blacks that would probably get into the panel. Because we knew we had a couple, we had two, so we felt for sure the system wasn't going to strike both of them because of potential Batson problems. And so we knew that if we had one in there he would be our protection, he would be our assurance that that verdict would be the product of the facts of this case and not the racial attitudes.

(Dkt. No. 25-8 at 150.) This evidence supports the PCR court's finding that trial counsel were cognizant of the potential for racial prejudice, and the PCR court reasonably concluded that trial

counsel were not deficient for failing to voir dire potential jurors about their racial attitudes in light of the highly deferential lens through which a court reviews counsel's decisions in voir dire. *See Gardner v. Ozmint*, 511 F.3d 420, 426 (4th Cir. 2007) ("On habeas review, federal courts generally accord 'particular deference' to the judgment of trial counsel during voir dire." (quoting *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001))).

The PCR court additionally found that Petitioner failed to demonstrate the he was prejudiced by trial counsel's failure to voir dire potential witnesses on their racial attitudes. The PCR court particularly noted that it had rejected Petitioner's argument that Juror A.H.'s decision was governed by considerations of race and that Petitioner had not presented any further evidence that additional voir dire would have resulted in the discovery of a racially prejudiced juror. (Dkt. No. 25-19 at 171.) As previously discussed with respect to Ground Two, the undersigned disagrees with the PCR court's rejection of the claim that Juror A.H. was racially biased at the time of Petitioner's trial. At the same time, the undersigned concedes that there is no reason to believe that additional voir dire would have uncovered that fact. At the PCR evidentiary hearing, Juror A.H. was adamant that he was not prejudiced, and there is no reason to believe that he would have admitted to having biased views during voir dire. Petitioner also failed to present any testimony regarding how Juror A.H. would have answered additional voir dire about his racial views at the time of Petitioner's sentencing proceeding. The undersigned agrees that Petitioner failed to show that he was prejudiced by trial counsel's failure to voir dire the jurors on their racial attitudes.

The PCR court's denial of the same argument raised in Petitioner's Ground Four was not based on unreasonable factual findings or an unreasonable application of federal law. As such, the undersigned recommends granting summary judgment to Respondents as to Ground Four.

**E.**     **Ground Five**

Petitioner raises three separate claims of ineffective assistance of trial counsel in Ground Five. He claims trial counsel were ineffective for: (1) failing to object to statements made by the Solicitor during the State's opening statement and closing argument; (2) failing to object to the trial court's instructions twice suggesting to the jury that another court would review the case; and (3) failing to object to a jury instruction that tended to inform the jury it could only consider Petitioner's character in the context of aggravating evidence rather than mitigating evidence. Petitioner and Respondents agree that these claims were properly raised and ruled upon in state court and are ripe for habeas review. Because in denying and dismissing these same claims, the PCR court made reasonable factual findings and reasonably applied federal law, the undersigned recommends granting Respondents' motion for summary judgment as to Ground Five.

The United States Supreme Court has said that a meritorious ineffective assistance of counsel claim must show two things: first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–96 (1984). A court's evaluation of counsel's performance under this standard must be "highly deferential," so as not to "second-guess" the performance. *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citation omitted); *see also Bowie v. Branker*, 512 F.3d 112, 119 n.8 (4th Cir. 2008); *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1297–99 (4th Cir. 1992); *Roach v. Martin*, 757 F.2d 1463, 1467 (4th Cir. 1985). In order to establish the second prong of *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" has been defined as "a

probability sufficient to undermine confidence in the outcome." *Id.* While *Strickland* itself is a deferential standard, when both § 2254(d) and *Strickland* apply, "review is doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Indeed, when § 2254(d) applies, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

**1.      Failure to Object to the State's Opening Statement and Closing Argument**

In his petition, Petitioner points out a number of comments made by the Solicitor during his opening statement and his closing argument, which Petitioner believes were dehumanizing, inflammatory, and/or racially loaded. According to Petitioner,

> During his opening statement, the solicitor made numerous remarks that dehumanized Bennett:

> • The solicitor described Bennett as "brutal monster size," app. 907, "big old brute, Johnny Bennett," App. 907, "big old bear of a fellow, Johnny Bennett," App. 911, "big old bear of a fist," app. 914.

> • Bennett's "disregard for a fellow human being, his disrespect for the law, his total disobedience and disrespect for good old human nature began way back, probably when he was born." App. 908.

> • "And, folks, you know about 25 feet away from you in your presence is a murderer. I hope you never have to live through [this] after this week, being that close to a murderer." App. 909.

> The solicitor continued to use inflammatory and racially loaded language in closing:

> • "There ain't no joy in Happy Town. He turned it into gruesomeville. It's boo hill." App. 2071.

> • Repeated references to the woman, who the solicitor previously described as the "blond lady," with whom Bennett had a sexual relationship. App. 2077.

- The solicitor referred to Bennett as a "mountain man" twice, app. 2056, 2070, "caveman," app. 2062, "Tiger," app. 2067, "monster," app. 2068, "King Kong," app. 2079, and "beast of burden," app. 2080.

- "Now you see. Now you see why I'm asking for the death penalty. It's warranted. It's appropriate. It's the punishment that fits this crime and that callous murder." App. 2081.

(Dkt. No. 46 at 54–55.) Petitioner asserts that trial counsel were ineffective for failing to object to all of these comments rather than just those where the Solicitor compared Petitioner to "King Kong" and "a caveman."

The PCR court rejected Petitioner's claims that his trial counsel were ineffective for failing to object during the Solicitor's opening statement and closing argument and that Petitioner was deprived of due process by the Solicitor's comments. The PCR court noted that the South Carolina Supreme Court had considered on direct appeal whether some of the comments violated Petitioner's due process and had found that they did not. (Dkt. No. 25-19 at 129, 137.) The PCR court also considered each of the other comments at issue and found that none of them so infected the trial with unfairness as to make the resulting conviction a denial of due process.[14] (Dkt. No. 25-19 at 131.)

As to the Solicitor's references to Petitioner being "a murderer," the PCR court found Petitioner could not "show any conceivable impropriety in this remark because he was and is a murderer" since Petitioner had been found guilty in his first trial, and his conviction had not been overturned. (Dkt. No. 25-19 at 138.) The PCR court's conclusion is supported by the record and demonstrates a reasonable application of federal law.

The PCR court found the Solicitor's references to Petitioner's "brute monster size," to his being a "bear of a fellow," and to his "big old bear of a fist" in opening statement were "fair comments in light of the evidence presented." (Dkt. No. 25-19 at 138). The PCR court found the same

---

[14] The PCR court used the same standards articulated above in the undersigned's discussion of Petitioner's Ground One.

was true of the Solicitor's remarks referencing "mountain man," "Tiger," "monster," and "beast of burden" in closing argument. (Dkt. No. 25-19 at 138.) In particular, the PCR court noted,

> Under the prosecution's theory and consistent with the testimony of the pathologist, the facts surrounding the murder demonstrated that the victim was struck several times with either a fist or a hard object, so hard that it dislocated his jaw and that these blows would have rendered him unconscious. *See* R. pp. 1692–97; 1701–02.
>
> Also, the more severe injuries were a series of sixty-four stabs [sic] wounds to the victim's head, neck, shoulders, upper chest and left hand.  R. pp. 1679–81; 1697–1722. . . .  Much like the reference to "King Kong" that was considered on direct appeal, the comments now at issue were not "an appeal to the passions of the jury."  The comment[s] referred to "Applicant's immense size, strength and the destructiveness of his previous crimes," *Bennett II*, 369 S.C. at 232, 632 S.E.2d at 288, as well as the murder itself.

(Dkt. No. 25-19 at 138–39.)  The PCR court further "expressly reject[ed] Applicant's contention that the Solicitor's comments were designed to improperly demean or denigrate him or to inject race into the jury's deliberations." (Dkt No. 25-19 at 139.) The PCR court reasonably determined that none of the above comments resulted in a fundamentally unfair trial to Petitioner, relying in part on the South Carolina Supreme Court's opinion in Petitioner's direct appeal. If the "King Kong" and "caveman" comparisons did not rise to the level of a due process violation, then it follows that the other remarks by the Solicitor also did not violate Petitioner's right to due process.

The PCR court further found "that the Solicitor's comments that '[t]here ain't no joy in Happy Town. He turned it into gruesomeville. It's boo [(sic)] hill. . . .' (R. p. 2071), were not improper attempts to inject race into the case." (Dkt. No. 25-19 at 140.) The PCR court noted that Victim lived in Happy Town and was murdered in that area. Then the PCR court rejected Petitioner's contention that "boo hill" was an implied racially disparaging reference, finding "[a] much more reasonable interpretation is that the Solicitor simply misspoke and intended to reference notorious cemeteries in the American West, such as Boot Hill graveyard in Tombstone, Arizona, which was made famous by the gunfight at the O.K. Coral [sic]." (Dkt. No. 25-19 at 140.) Petitioner has failed to show by clear and convincing evidence that the PCR court's interpretation was unreasonable. In context, the PCR

court's interpretation—that the Solicitor was actually referencing a cemetery where people were buried still wearing their boots—makes more sense than Petitioner's proffered interpretation—that the Solicitor was making a racially disparaging reference. The record shows that Victim was found fully clothed and wearing white tennis shoes. (Dkt. No. 25-10 at 216–22; Dkt. No. 25-11 at 209.) The PCR court's factual findings are reasonable, and Petitioner has failed to show by clear and convincing evidence that the PCR court's interpretation of the record was erroneous.

At the conclusion of his closing argument, the Solicitor told the jury, "Now you see. Now you see why I'm asking for the death penalty. It's warranted. It's appropriate. It's the punishment that fits this crime and that callous murder." (Dkt. No. 25-12 at 104.) While recognizing that in *State v. Northcutt*, 372 S.C. 207, 641 S.E.2d 893 (2007), the South Carolina Supreme Court had reversed a death sentence where similar arguments had been made by the prosecution, the PCR court found that the comments by the Solicitor in this case did not so infect the trial with unfairness so as to make the resulting conviction a denial of due process. (Dkt. No. 25-19 at 143.) In *Northcutt*, the Solicitor (also Solicitor Myers) made a number of improper arguments when seeking the death penalty for a man who had killed his infant daughter, including arguing that there would be an "open season on babies in Lexington County" if the death penalty was not returned in that case, stating that he "expect[ed]" the death penalty, and draping a large black shroud over a baby's crib and wheeling the crib from the courtroom in a staged funeral procession. 372 S.C. at 222–23, 641 S.E.2d at 881. Contrasting the Solicitor's arguments in Petitioner's case from those in *Northcutt*, the PCR court noted that the Solicitor's argument here "squarely addressed the fact that the decision still rested with the jury and that it had not been made for them . . . ." (Dkt. No. 25-19 at 144.) The PCR court also noted that "unlike *Northcutt*, the Solicitor's comment was not surrounded by reversible error." (Dkt. No. 25-19 at 144.) The PCR court also noted that in another case a nearly identical argument made by the same Solicitor had been upheld by the South Carolina Supreme Court. (Dkt. No. 25-19 at 145 (citing *State*

50

*v. Bell*, 302 S.C. 18, 33–34, 393 S.E.2d 364, 372–73 (1990) (where the Solicitor argued "if 'this [wasn't] a case in which a jury should impose the death penalty, if this [wasn't] the type of case in which the State should seek the death penalty and expect the death penalty, then there is none'")).) The undersigned cannot say that the PCR court's findings were unreasonable.

Based on its conclusions that none of the comments at issue resulted in a trial that was fundamentally unfair to Petitioner, the PCR court determined that Petitioner could not "show any conceivable prejudice resulting from trial counsel's performance . . . ." (Dkt. No. 25-19 at 137.) The PCR court further noted that "considering the overwhelming evidence presented that established Applicant's guilt of the four statutory aggravating circumstances beyond a reasonable doubt, the Court finds that Applicant failed to prove that he was prejudiced by any of the Solicitor's comments in his opening statement or closing argument." (Dkt. No. 25-19 at 147.) And the PCR court ultimately denied and dismissed Petitioner's claim that trial counsel were ineffective for failing to object to comments by the Solicitor where those comments did not violate Petitioner's due process. The undersigned cannot say that the PCR court's conclusion was based on unreasonable factual findings or an unreasonable application of federal law. *Cf. Oken v. Corcoran*, 220 F.3d 259, 269–70 (4th Cir. 2000) ("[T]rial counsel was not constitutionally ineffective in failing to object to . . . certain remarks made by the prosecutors in their closing argument because it would have been futile for counsel to have done so, given the 'wide latitude' accorded counsel in making closing arguments, and given that the prosecutors' remarks, read in context, did not . . . infringe upon [the defendant's] constitutional rights."). This claim does not warrant habeas relief.

### 2.    Failure to Object to the Trial Court's Instruction Regarding Appellate Review

Petitioner asserts that trial counsel should have objected to two of the sentencing court's statements to the jury, which indicated that his instructions on the law were reviewable. In particular, the sentencing judge twice told the jury that they had to accept his instructions on the law as he gave

them but that if he was wrong, "there [was] a time and place for it to be corrected. . . ." (Dkt. No. 25-8 at 169; Dkt. No. 25-12 at 135 ("[I]f I'm wrong there is another time and place for it to be corrected.").) Petitioner claims that trial counsel should have objected to these instructions because they implied the existence of appellate review. The PCR court found that Petitioner failed to establish either deficient performance or resulting prejudice as to this claim. (Dkt. No. 25-19 at 77.)

In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the United States Supreme Court held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328–39. In that case, the prosecutor had minimized the importance of the jury's role in the sentencing phase, arguing, "'Now, they would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable.'" *Id.* at 325. When defense counsel objected to the prosecutor's statements, rather than correcting the statements, the court stated, "'I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands.'" *Id.* at 325. Justice Marshall, delivering the opinion of the Court, cautioned that

> the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role. Indeed, one can easily imagine that in a case in which the jury is divided on the proper sentence, the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in.

*Id.* at 333.

The PCR court found the trial court's instructions in this case did "not approach the direct statements of unfettered appellate review" by the prosecutor in *Caldwell*, nor was there any "reasonable likelihood that the jury would have understood those remarks as implying that the appellate court had unfettered review of the jury's verdict in either phase." (Dkt. No. 25-19 at 80.) Petitioner claims that the PCR court only speculated that the jurors did not take the instructions to

mean that their verdict would be reviewed; however, the undersigned finds that a fair reading of the record supports the PCR court's findings. Indeed, the sentencing judge's statements referencing future review were only directed to his instructions on the law. And when he made the statements, he had already described to the jurors their duties, and he had moved on to describing his duties as the judge. (*See* Dkt. No. 25-8 at 166–69; Dkt. No. 25-12 at 129–36.) His statements about "another time and place" appear to have been made to inform the jury that they were not to alter his instructions on the law based on their own beliefs about what the law was or what it should have been—that was not in their province as jurors. The sentencing judge never stated or suggested that the jury's decision was reviewable, and Petitioner can only speculate that the jury would have taken the judge's instruction to mean that. Thus, there was no reason for trial counsel to object to the sentencing court's instructions on that basis.

The PCR court further found that even if the sentencing court's instructions were objectionable, there was no prejudice where the court later expressly instructed the jury that they were not to consider future appeals in deciding Petitioner's sentence. During the jury's deliberations, the jury asked, "[I]f we decide death penalty, when would it be put into effect, and if there were to be an appeal how many appeals do they allow?" (Dkt. No. 25-12 at 165.) The sentencing judge responded to that question as follows:

> Now, this is a matter that a jury is not allowed to go into. Again, it's something that I really couldn't answer for you anyway. As you understand, there's nothing in the record about something like this.
>
> And remember, as I told you earlier at the very start, that you must decide this based only on the evidence that has come into the courtroom, and there's been nothing in the record about this. So be sure you stay within the record, okay, within what was in the courtroom. And, again, this is an area that you cannot go into.

(Dkt. No. 25-12 at 168–69.) Based on those instructions, the PCR court concluded that Petitioner "failed to prove 'a reasonable probability that . . . the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" (Dkt. No. 25-19 at 82 (quoting

*Strickland*, 466 U.S. at 695; *Wiggins v. Smith*, 539 U.S. 510, 537).) The PCR court reasonably found there was no prejudice by trial counsel's failure to object to the sentencing court's earlier instructions where the jury was expressly informed that they should not consider future appeals when deciding the appropriate sentence.

Because the PCR court made reasonable factual findings and reasonably applied federal law in rejecting this claim of ineffective assistance of counsel, Petitioner is not entitled to habeas relief based on this Ground Five claim. The undersigned therefore recommends granting summary judgment to Respondents as to this claim.

> **3.** **Failure to Object to the Trial Court's Instruction Regarding the Consideration of Character Evidence**

In his third claim under Ground Five, Petitioner contends that trial counsel should have objected to the trial court's instructions to the jury on character evidence. According to Petitioner,

> At Bennett's trial, the court specifically instructed the jurors that they could consider Bennett's character in the context of aggravating evidence, but conspicuously absent was a similar instruction that the jurors could also consider character as mitigation. Indeed, the trial court defined and described character evidence as being a type of aggravation:

> > Now, in this case the State has also presented other aggravating circumstances . . . but as I indicated, the State must also prove beyond a reasonable doubt any general aggravating circumstances. These are sometimes called character evidence. And, in essence, these are presented through evidence of crimes or bad acts or rules infraction.

> > . . .

> > The evidence of other crimes or bad acts or rules infractions should be considered as evidence of an aggravating circumstance, but if you are convinced beyond a reasonable doubt that the defendant committed these other crimes or bad acts or rules infractions then you may consider them as evidence of the defendant's character and characteristics as they bear relevance to the claim.

(Dkt. No. 46 at 66.) Counsel Floyd testified that he did not have a strategic reason for failing to object to the sentencing court's description of character evidence. (Dkt. No. 25-16 at 42.)

The PCR court rejected this claim, finding Petitioner had failed to show either deficient performance or prejudice. In coming to that conclusion, the PCR court first outlined the sentencing judge's instructions to the jury regarding aggravating and mitigating circumstances (both statutory and nonstatutory). (Dkt. No. 25-19 at 148–52.) The PCR court then found as follows:

> This Court does not question that the sentencing jury in a capital case may not be precluded from considering as mitigating evidence any aspect of the defendant's character or record and any circumstances of the crime that may serve as a basis for a sentence less than death. *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *State v. Cooper*, 291 S.C. 332, 353 S.E.2d 441 (1986). However, considering the jury instructions as a whole, *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973) (jury instruction must be viewed in the context of the overall charge), the Court finds that there is no reasonable likelihood that the jury would have understood the instructions as preventing jurors from considering any relevant aspect of Applicant's character in mitigation of his sentence. *Boyde* [*v. California*], 494 U.S. [370,] 381 [(1990)) (question is whether there is reasonable likelihood that the trial judge's charge was considered in an unconstitutional manner).

> The instructions specified that the State had the overall burden of proof, and that Applicant did not have any burden. The portion of the charge complained of by Applicant—referring to character evidence—merely sought to differentiate between evidence relating only to Applicant's bad character, from evidence of a statutory aggravating circumstance(s). The jury instructions clearly prohibited the jury from imposing a death sentence, unless it first unanimously found that the State had established one statutory aggravating circumstance beyond a reasonable doubt. On the other hand, evidence of his bad character was limited to consideration of his bad character. This accurately stated South Carolina law. *See, e.g.*, *State v. Matthews*, 296 S.C. 379, 373 S.E.2d 587 (1988); *State v. Shaw*, 273 S.C. 194, 255 S.E.2d 799 (1979).

(Dkt. No. 25-19 at 152–53.) The PCR court reasonably found that the sentencing judge's instructions did not preclude the jury from considering character evidence in mitigation. Indeed, the court's specific reference to character evidence while discussing statutory and nonstatutory aggravating factors merely advised the jury that there was limited evidence that they could consider in aggravation. (*See* Dkt. No. 25-19 at 146–46.) On the other hand, the court clearly informed the jury that they were "required to consider any circumstance of any nature whatsoever as a reason for not imposing the death penalty. Any factor may be taken into account as the reason for not imposing the death sentence." (Dkt. No. 25-12 at 151.) The sentencing court's instructions were not objectionable as they informed the jury that they had to consider any evidence in mitigation, which included character evidence and more.

Because the sentencing court's instructions on character evidence were not objectionable, trial counsel were not deficient in failing to object to them. Furthermore, there was no resulting prejudice since the sentencing court properly charged the law. The PCR court reasonably found that Petitioner failed to establish either prong of *Strickland*, and as such, Petitioner is not entitled to habeas relief on the third claim of his Ground Five.

For all of the foregoing reasons, the undersigned recommends granting summary judgment to Respondents as to Petitioner's Ground Five.

## F.    Ground Six

In his Ground Six, Petitioner claims that appellate counsel was ineffective for failing to argue on direct appeal that evidence of the Pizza Hut incident should have been excluded as irrelevant and in violation of South Carolina Rule of Evidence 403. According to Petitioner, "[a]ppellate counsel argued three pieces of evidence were improperly admitted as victim impact evidence: (1) the testimony of the assault victims' mothers, (2) photographs of the assault victims from the hospital, and (3) Gilbert's 'black Indian' dream testimony[,]" but appellate counsel should have challenged the evidence (presumably all three pieces of that evidence) on relevancy and Rule 403 grounds. (Dkt. No. 46 at 69.)

The PCR court considered this same claim along with two other claims of ineffective assistance of appellate counsel, and the court rejected all three claims of ineffective assistance of appellate counsel. (Dkt. No. 25-19 at 181–83.) Unfortunately, due to the organization of that portion of the PCR court's order, it is difficult to discern what reasoning led the PCR court to the rejection of this particular claim. Nevertheless, based on the undersigned's own review of the record, the undersigned concludes that it was reasonable for the PCR court to deny and dismiss Petitioner's claim that appellate counsel was ineffective for failing to challenge the Pizza Hut evidence on relevancy and Rule 403 grounds. As such, the undersigned recommends granting Respondents's motion for summary judgment as to Ground Six.

At Petitioner's trial, the State introduced evidence of the Pizza Hut assaults through the testimony of multiple witnesses, including the victims (Shannon Gilbert and Aaron McGough), the victims' mothers, and others who saw the assaults taking place.  Before Shannon Gilbert's mother took the stand, defense counsel requested a brief bench conference. (Dkt. No. 25-9 at 35.)  Prior to Aaron McGough's mother's testimony, defense counsel noted "our objection to this type of testimony." (Dkt. No. 25-9 at 54.)  During the testimonies of the mothers, defense counsel also objected to the introduction of photographs of Gilbert and McGough in the hospital, arguing that the photographs were inflammatory.  (Dkt. No. 25-9 at 38, 58.) The sentencing court admitted the photographs, finding they were "appropriately depictive of the witness's testimony" and were not "so graphic or inflammatory as to cause any problems." (Dkt. No. 25-9 at 38, 58.)  The sentencing judge later memorialized defense counsel's objections to the mothers' testimonies. (Dkt. No. 25-9 at 62–63.) Defense counsel explained, "what we objected to was any testimony about the extent of the injuries suffered by the boys in the Pizza Hut incident as being inappropriate, victim impact type of information and having nothing to do with the particular crime that Mr. Bennett is on trial for now." (Dkt. No. 25-9 at 62.) The sentencing judge then explained that he had overruled the objection "based on [his] understanding of the rules that in this particular proceeding it is appropriate to allow testimony as to the extent of the beatings that the defendant has alleged to have placed on these two particular young men." (Dkt. No. 25-9 at 63.)

Appellate counsel only argued on direct appeal that the victims' mothers' testimonies, the hospital photographs, and the testimony about the black Indians dream were impermissible victim impact evidence.  (Dkt. No. 25-13 at 234–49.)  The South Carolina Supreme Court found that none of the challenged evidence could be considered victim impact evidence.  *Bennett II*, 369 S.C. at 228–30, 632 S.E.2d at 286–87.  As to the testimony from the mothers, the court found that "evidence was clearly not evidence of the character of the victims or the impact on their families, but rather, evidence of the physical injuries caused by Appellant." *Id.* at 228, 632 S.E.2d at 286. And though "the photographs in this case were certain to elicit an emotional response from the jury, these photographs

were highly probative of the nature of Appellant's prior crime in that they provided the clearest picture of the aggravated nature of the assault and battery." *Id.* at 229, 632 S.E.2d at 287. The court further concluded that the black Indians testimony "merely described the emotional injury to the ABHAN victim." *Id.* The supreme court then went on to acknowledge that defense counsel had made objections in terms of relevance and Rule 403, SCRE, but appellate counsel had not made those same arguments to the court. *Id.* The court further noted the following:

> Because the evidence in this case was not victim impact evidence, Appellant's arguments must fail. When asked to do so, we will consider arguments regarding the types of evidence of prior crimes that should and should not be admissible in a capital sentencing proceeding. However, we feel that the delicate task of balancing the duty to conduct a sentencing inquiry "broad in scope," *Dawson* [*v. Delaware*], 503 U.S. [159,] 164, against the need to protect a capital defendant from unfair prejudice and prevent a capital sentencing proceeding from transmuting into a sentencing referendum on all of the defendant's prior crimes is only properly performed when that case is presented. Such a case would no doubt involve considerations of when the introduction of evidence renders a proceeding so unfair as to violate due process, *see Payne* [*v. Tennessee*], 501 U.S. [808,] 831, and would implicate our rules of evidence; rules which, at the most basic level, allow proof of character by specific instances of conduct. *See* Rule 405, SCRE.

> Instead of addressing any of these topics, which would be of paramount importance when considering clarifying our relevance rules, the briefs to this Court, like Appellant's argument, concerned only victim impact evidence. Under these circumstances, we feel the better course is to confine ourselves to a careful analysis of the arguments briefed and presented to us.

*Id.* at 229–30, 632 S.E.2d at 287.

Appellate counsel is not obligated to raise all nonfrivolous grounds on appeal. As the United States Supreme Court has recognized, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). The Fourth Circuit has held that "[i]n deciding which issues to raise on appeal, [appellate counsel] is entitled to a presumption that he decided which issues were most likely to afford relief on appeal. A decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993).

It was reasonable for the PCR court to decline to find that appellate counsel was deficient in failing to challenge the Pizza Hut assault evidence on relevance and Rule 403 grounds.  The South Carolina Supreme Court's opinion in *Bennett II* clearly recognizes that in capital sentencing proceedings South Carolina law permits the introduction of proof of character by specific instances of conduct, particularly by a defendant's prior convictions. 369 S.C. at 230 n.2, 632 S.E.2d at 287 n.2. All of the evidence that Petitioner believes appellate counsel should have challenged related to the injuries sustained by the victims of Petitioner's prior crimes, and those injuries were probative of the aggravated nature of the assaults.  *See id.* at 228–29, 632 S.E.2d at 286–87.  Given the probativeness of the evidence, as recognized by the sentencing judge and the South Carolina Supreme Court, and the fact that such evidence is admissible in capital sentencing proceedings in South Carolina, there is no reason to believe that appellate counsel was deficient in arguing that the evidence was inadmissible victim impact evidence rather than arguing that the evidence was not relevant or was more prejudicial than probative.

Furthermore, even assuming appellate counsel was deficient for failing to raise relevance and Rule 403, SCRE, Petitioner did not show resulting prejudice.  Despite the South Carolina Supreme Court's apparent desire to clarify its relevance rules, the court's own opinion indicated that the photographs were more probative than prejudicial;[15] thus, there is no reason to believe that a challenge to that evidence on either relevance grounds or Rule 403 grounds would have been successful. Furthermore, though the photographs "provided the clearest picture of the aggravated nature of the assault and battery[,]" the other testimony was similarly directed to the extent of the victims' injuries. As such, it was also relevant, and Petitioner failed to persuade the PCR court (nor has Petitioner persuaded the undersigned) that the South Carolina Supreme Court would have reversed Petitioner's

---

[15] *See Bennett II*, 369 S.C. at 229, 632 S.E.2d at 287 ("Although . . . the photographs in this case were certain to elicit an emotional response from the jury, these photographs were *highly probative* of the nature of Appellant's prior crime in that they provided the clearest picture of the aggravated nature of the assault and battery." (emphasis added)).

death sentence had appellate counsel challenged the admission of that evidence on relevance and Rule 403 grounds. *See Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (holding, in the context of an ineffective assistance of counsel claim, that the "prejudice" element of the *Strickland* standard is satisfied by a showing of a reasonable probability defendant would have prevailed on appeal but for appellate counsel's deficient performance).

Again, while it is difficult to decipher exactly why the PCR court found Petitioner had failed to establish either deficient performance or prejudice as to this ineffective assistance of appellate counsel claim, the undersigned concludes that the record supports the denial of this claim. The undersigned cannot say that the PCR court's decision is based on unreasonable factual findings or an unreasonable application of federal law. The undersigned recommends granting summary judgment as to Ground Six.

## G.    Ground Seven

In the final ground raised in his habeas petition, Petitioner asserts that he was denied his Sixth Amendment right to impeach and confront witnesses against him because he was denied access to potential impeachment material on the State's witnesses. This ground was addressed in *Bennett I* and has therefore been properly presented in state court and is appropriate for habeas review. Because the state court's decision was not based on an unreasonable factual finding or the result of an unreasonable application of federal law, the undersigned recommends denying and dismissing Ground Seven.

Prior to Petitioner's first sentencing proceeding, defense counsel requested that the trial court compel the production of the personnel records of a number of guards from the Lexington County Detention Center (LCDC) on the theory that the records may have contained potential impeachment information. (Dkt. No. 24-13 at 88–96.) Defense counsel was particularly interested in gathering information about LCDC guards who were connected to a cigarette smuggling operation that also involved Petitioner. (Dkt. No. 24-13 at 93–94.) The trial court required the State to produce the

personnel records to the court for an *in camera* review. (Dkt. No. 24-14 at 54–55.) After reviewing the records, the trial court required that certain documents be disclosed to defense counsel and sealed other documents for the South Carolina Supreme Court to review on appeal. (Dkt. No. 24-14 at 320–23; Dkt No. 24-15 at 30–31.) In *Bennett I*, the South Carolina Supreme Court stated, "We have thoroughly reviewed the records sealed to this Court. Our review reveals no relevant evidence which Bennett could have used for impeachment purposes. Accordingly, the trial court committed no error in refusing disclosure of these files." 328 S.C. at 267, 493 S.E.2d at 853.

In the instant petition, Petitioner claims that "[t]he trial judge's refusal to require the State to produce all personnel records that may have been relevant violated Bennett's due process rights under *Brady* and its progeny." (Dkt. No. 46 at 75.) Because Petitioner had been unable to review the documents at any point, he asked the undersigned to either unseal the LCDC records for his counsel's review or to perform an *in camera* review of the records to determine if they contained any material information. (Dkt. No. 46 at 76; Dkt. No. 66 at 21.) Thereafter, Respondents provided Petitioner with the documents, correspondence, or communication relating to the Lexington County Sheriff's Office's investigation of Petitioner and LCDC officials for possessing and selling contraband within the detention center.[16] (Dkt. No. 87.) As to the personnel files and disciplinary records of individuals who worked for LCDC, the undersigned reviewed those documents *in camera* and found that the production of those records was not warranted. (Dkt. No. 91.)

"A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). Evidence is favorable if it is either exculpatory or impeaching. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood*, 547 U.S. at 870

---

[16] According to counsel for the Respondents, those same documents had been provided to defense counsel at the time of the first trial.

(internal quotation marks omitted). However, "a 'showing of materiality does not require demonstration by a preponderance of the evidence that a disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,'" *id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)), but only a "'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict,'" *id.* (quoting *Kyles*, 514 U.S. at 435). The assessment of materiality is made in light of the entire record. *United States v. Agurs*, 427 U.S. 97, 112 (1976).

Petitioner's due process claim hinges on the assertion that "the personnel files and discipline records may have been material" to his case. But the trial court found that there was no need for defense counsel to review those documents, and the South Carolina Supreme Court confirmed that the documents contained "no relevant evidence which Bennett could have used for impeachment purposes[,]" *Bennett I*, 328 S.C. at 267, 493 S.E.2d at 853. Having reviewed those same materials, the undersigned concludes that it was not unreasonable for the trial court to refuse to compel the disclosure of the personnel files, nor were Petitioner's due process rights violated by the nondisclosure of the documents. As such, Petitioner is not entitled to habeas relief. The undersigned recommends granting Respondents' motion for summary judgment.

## CONCLUSION

It is RECOMMENDED, for the foregoing reasons, that Motions for Summary Judgment (Dkt. No. 60; Dkt. No. 67) be DENIED. It is further RECOMMENDED that Petitioner's habeas petition be GRANTED as to Ground Two, that his death sentence be VACATED, and that Respondents be given a limited period of time within which to conduct a resentencing trial or impose a lesser sentence consistent with the law. It is additionally RECOMMENDED that the District Court issue a certificate of appealability as to Ground One and Ground Two.

IT IS SO RECOMMENDED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

January 11, 2016
Charleston, South Carolina

**The parties' attention is directed to the important notice on the next page.**

63

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.**  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).