IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Johnny O'Landis Bennett, | ) | Civil Action No. 2:13-3191-RMG |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Bryan P. Stirling, *Commissioner*, *South,* | ) | |
| *Carolina Department of Corrections, and* | ) | |
| Joseph McFadden, *Warden, Lieber* | ) | |
| *Correctional Institution,* | ) | |
| | ) | |
| Respondents. | ) | |

This matter is before the Court on the Report and Recommendation ("R. & R.") of the Magistrate Judge, recommending that the Court grant the Petitioner's writ of habeas corpus on the basis of Ground Two of the petition. (Dkt. No. 98.) After a careful review of the voluminous record in this matter, the decisions of the state courts, the briefs of the parties, and the relevant case law, the Court grants the Petitioner's writ of habeas corpus separately and independently on the bases of Grounds One and Two of the petition, setting aside the sentence of death and returning the matter to the Lexington County Court of General Sessions for resentencing within 180 days of this order. This decision is based upon the Court's strong conviction that the injection of race by the prosecutor into the sentencing phase of the trial and the seating of a racially biased juror "so infected the proceeding as to deny [Petitioner] due process of law." *Miller v. United States*, 583 F.2d 701, 707 (4th Cir. 1978).

I.    **Background**

Petitioner was indicted by the Lexington County Grand Jury in September 1993 for murder, kidnapping, armed robbery, and larceny. The State served notice of intent to seek the death penalty and notice of evidence in aggravation. The State's evidence at trial included testimony that

Petitioner's victim had been stabbed more than 70 times with a Phillips-head screwdriver and had died as a result of internal bleeding. *State v. Bennett*, 493 S.E.2d 845, 846 (S.C. 1991) ("*Bennett I*"). After an October 9–18, 1995 trial, Petitioner was convicted on all charges. After a separate penalty proceeding, Petitioner was sentenced to death for murder. On December 1, 1997, the South Carolina Supreme Court affirmed Petitioner's criminal convictions, reversed Petitioner's death sentence, and remanded the case to the trial court for a new sentencing proceeding. The South Carolina Supreme Court's decision in *Bennett I* was based on the determination that the trial court had improperly allowed a juror to be qualified after he stated that he would "go with the majority of the jury" if he had doubts "as to whether the defendant should get the death penalty." Under those circumstances, the South Carolina Supreme Court concluded that Petitioner was "denied an independent decision as to his punishment." *Bennett I*, 493 S.E.2d at 847–48.

A second sentencing proceeding was conducted in the Lexington County Court of General Sessions on July 10–16, 2000, with Eleventh Circuit Solicitor Donald V. Myers again seeking the death penalty. Notably, the jury in the second sentencing proceeding was all-white, which had not been the case in the Petitioner's first sentencing proceeding. Both Petitioner and his victim were African-American. Unlike the first sentencing proceeding, the second sentencing proceeding involved repeated direct and indirect references to race made or elicited by Solicitor Myers and vigorous objections by defense counsel, who argued that the prosecutor was intentionally injecting race into the trial.

The first of these racial issues involved testimony elicited by the Solicitor from a witness who had been attacked and beaten by Petitioner in an incident that predated the murder for which Petitioner was then on trial. After the witness, Shannon Gilbert, who was white, testified that he had been attacked by Petitioner and was in a coma for approximately two weeks following the

-2-

assault, the Solicitor asked him whether he had "any dreams or anything" while in a coma. Defense counsel immediately objected, arguing that he could not imagine how such testimony would be relevant. The Solicitor responded, "[h]e'll bring out the relevance." The witness then recounted his dream of "Indians were chasing me trying to kill me, and the thing I thought was they were black." (Dkt. No. 25-9 at 50–51.) Defense counsel again objected to the testimony and later moved for a mistrial. (*Id.* at 51, 63–64.) He observed that this type of racial reference had not occurred in the first trial where "we had a couple black jurors" but now with an all-white jury the prosecutor was "hit[ting] this jury with race, race, race." (*Id.* at 63.) Defense counsel argued that "there was no relevance" to the prior victim's dream testimony "except to inflame a white jury" and called the Solicitor's actions "a gross violation of this man's rights." (*Id.* at 63.) The state trial court denied defense counsel's motions regarding the "black Indian" dream testimony, erroneously finding that the State had not elicited the testimony. (Dkt. No. 25-13 at 185.)

The Solicitor further offered testimony that Petitioner had engaged in sexual relations with a female prison guard while incarcerated awaiting trial to support his argument that Petitioner continued to be engaged in misconduct after his crimes. Initially, the Solicitor did not introduce evidence regarding the race of the guard. However, while cross-examining a character witness for Petitioner, a fellow inmate, the Solicitor asked the witness about the relationship between the Petitioner and the female prison guard. The witness asked whether he was referring to "[t]he real big lady," and the Solicitor responded, "[guard's name], you remember her, the blond-headed lady." (Dkt. No. 25-11 at 500–501.) Defense counsel promptly moved for a mistrial, arguing that the Solicitor had again intentionally injected race into the proceeding in front of an all-white jury by alerting the jury that the Petitioner's lover was a white woman. Calling the Solicitor's conduct "one of the most despicable performances I've ever seen a Solicitor where a Solicitor inserted race

into this case," defense counsel urged the court to declare a mistrial. (Dkt. No. 25-12 at 35–36.) The Solicitor argued that a reference to a blond-headed woman did not necessarily equate to a white women, in which defense counsel responded "[d]id anybody in this courtroom not think he was telling them that was a white woman. I think it is clear and I think the record will be clear on that." (*Id.* at 37.) The trial court again overruled defense counsel's motion, observing "maybe I'm just overly naïve, but I'll be honest, maybe it just the way things are these days, but when somebody says blonde, I don't necessarily see a white woman." (*Id.* at 38.)

During closing argument, Solicitor Myers made repeated references to Petitioner's size (6' 7", 300 pounds) and his potential dangerousness because of his violent nature. (Dkt. No. 25-12 at 102.) Responding to the defense's evidence that Petitioner had been a compliant prisoner, the Solicitor argued that if "[i]f you give him life, the real Johnny will come back. You give him life and he'll come back out. Meeting him again will be like meeting King Kong on a bad day." (*Id.*). The Solicitor also referred to the Petitioner as a "monster," a "caveman" and a "beast of burden" during his closing argument. (*Id.* at 85, 91, 103.) Defense counsel did not make an objection at the time of the Solicitor's argument but later moved for a mistrial because the King Kong reference was an appeal to racial prejudice. The trial court rejected the argument, finding that the "comment did not infect the trial with unfairness, did not prejudice the Defendant, and was not a denial of due process or fundamental fairness." (Dkt. No. 25-13 at 189.)

The jury in the second sentencing proceeding found the existence of four statutory aggravating factors, and Petitioner was again sentenced to death. On June 26, 2006, the South Carolina Supreme Court affirmed the death sentence. *State v. Bennett*, 632 S.E. 2d 281 (S.C. 2006) ("*Bennett II*"). The United States Supreme Court denied certiorari on November 27, 2006. *Bennett v. South Carolina*, 549 U.S. 1061 (2006).

On September 7, 2006, Petitioner filed an application for post-conviction relief ("PCR"). During a 2007 interview, PCR counsel asked a juror in the second sentencing jury (identified herein as the "Juror")[1], "why did you think Mr. Bennett had killed the victim?" The Juror responded, "because he was just a dumb nigger." (Dkt. No. 25-16 at 18.) Testifying at the May 28, 2008 PCR evidentiary hearing, the Juror admitted that he made that statement. The Juror further testified, "I apologize for saying that word, but after going through that thing for an entire week and all the evidence piling up against him, that was just the way I felt about it." (*Id.* at 18–19.) On cross-examination by the State, the Juror testified that he was not prejudiced and Petitioner's race played no part in his decision imposing death. (*Id.* at 24.) The PCR trial court found that the Juror's expressed bias did not justify relief because it only came into existence sometime after the sentencing hearing and because it did not establish that the Juror "was racially biased at the time of the resentencing trial." (Dkt. No. 25-19 at 76.) Petitioner filed a motion to alter or amend the PCR court's judgment, which was denied by an order filed October 8, 2009, and a petition for a writ of certiorari with the South Carolina Supreme Court, which was denied on November 7, 2013 (remittitur issued November 25, 2013).

Petitioner then timely filed the present petition on November 3, 2014. Petitioner raises seven grounds for relief: (1) Petitioner's second sentencing proceeding was rendered fundamentally unfair by the Solicitor's repeated racial comments, (2) Petitioner's right to an impartial jury was violated by the seating of a juror who later testified that he voted to convict Petitioner because he was "just a dumb nigger," (3) Petitioner's defense counsel at the second sentencing hearing was constitutionally ineffective in failing to challenge the State's purportedly

---

[1] As this district's ECF filing policies require parties to redact all personal information that may identify a juror, the Court will do likewise to preserve the intent of the rule. *See* ECF Filing Policies & Procedures, D.S.C., § 13.4.2 (May 12, 2006).

race-based decision to seek the death penalty, (4) Petitioner's defense counsel was constitutionally ineffective for failing to *voir dire* veniremen on their racial biases, (5) Petitioner's defense counsel was constitutionally ineffective for failing to object to several jury instructions and statements by the Solicitor, (6) Petitioner's appellate counsel for his direct appeal from his second sentencing proceeding was constitutionally ineffective for failure to challenge the State's introduction of extrinsic evidence of a twelve-year-old cross-racial assault, and (7) Petitioner's Sixth Amendment rights were violated by denial of access to potential impeachment material on the State's witnesses.

Respondents moved for summary judgment on all asserted grounds for relief on January 23, 2015, and Petitioner moved for summary judgment on Ground One and Ground Two of the petition on March 16, 2015. (Dkt. Nos. 60, 67.) On January 11, 2016, the Magistrate Judge issued a Report and Recommendation recommending that the petition be granted as to Ground Two, regarding the allegedly racially biased juror, and denied as to all other asserted grounds for relief. (Dkt. No. 98.)

## II.  Legal Standard

### A.  Report and Recommendation of the Magistrate Judge

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge. 28 U.S.C. § 636(b)(1).

When a proper objection is made to a particular issue, "a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate." *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992). However, "[t]he

district court's decision whether to consider additional evidence is committed to its discretion, and any refusal will be reviewed for abuse." *Doe v. Chao*, 306 F.3d 170, 183 & n.9 (4th Cir. 2002). "[A]ttempts to introduce new evidence after the magistrate judge has acted are disfavored," though the district court may allow it "when a party offers sufficient reasons for so doing." *Caldwell v. Jackson*, 831 F. Supp. 2d 911, 914 (M.D.N.C. 2010) (listing cases).

**B.    Summary Judgment**

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

C.    **Habeas Corpus**

1.    Standard for Relief

Claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the decision was "contrary to, or involved an unreasonable application of clearly established federal law as decided by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2). Section 2254(d) codifies the view that habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (stating that "'[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'" (quoting *Harrington*, 562 U.S. at 103)).

Therefore, when reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 410 (2000); *see also White*, 134 S. Ct. at 1702 (describing an "unreasonable application" as "objectively unreasonable, not merely wrong" and providing that "even clear error will not suffice" (internal

quotation marks and citation omitted)). Moreover, review of a state court decision does not require an opinion from the state court explaining its reasoning. *See Harrington* at 98 (finding that "[t]here is no text in [§ 2254] requiring a statement of reasons" by the state court). If no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief. *Id.* Pursuant to § 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. *Id.* at 102. And state court factual determinations are presumed to be correct and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

      2.     <u>Procedural Default</u>

A habeas corpus petitioner may obtain relief in federal court only after he has exhausted his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997), *abrogated on other grounds by United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011); *see also In re Exhaustion of State Remedies in Criminal & Post-Conviction Relief Cases*, 471 S.E.2d 454, 454 (S.C. 1990) (holding that "when the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies"). To exhaust his available state court remedies, a petitioner must "fairly present[] to the state court both the operative facts and the controlling legal principles associated with each claim." *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks and citation omitted).

Generally, a federal habeas court should not review the merits of claims procedurally defaulted (or barred) under independent and adequate state procedural rules. *Lawrence v. Branker*, 517 F.3d 700, 714 (4th Cir. 2008). For a procedurally defaulted claim to be properly considered by a federal habeas court, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### D.    Ineffective Assistance of Counsel

When claiming habeas relief due to ineffective assistance of counsel at trial, a petitioner must show (1) that his trial counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that but for counsel's error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The Court must apply a "strong presumption" that trial counsel's representation fell within the "'wide range of reasonable professional assistance," and the errors must be "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington*, 131 S. Ct. at 787. This is a high standard, one in which a habeas petitioner alleging prejudice must show that counsel's errors deprived him "of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. That the outcome would have been "reasonably likely" different but for counsel's error is not dispositive of the "prejudice" inquiry. Rather, the Court must determine whether the result of the proceeding was fundamentally unfair or unreliable. *Harrington*, 131 S. Ct. at 787–88; *Strickland*, 466 U.S. at 694.

The Supreme Court has cautioned that "'[s]urmounting *Strickland*'s high bar is never an easy task[,]' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 131 S. Ct. at 788 (quoting *Padilla v. Kentucky*,

130 S. Ct. 1473, 1485 (2010)). When evaluating an ineffective assistance of counsel claim, the petitioner must satisfy the highly deferential standards of 28 U.S.C. § 2254(d) and *Strickland* "in tandem," making the standard "doubly" more difficult. *Id.* In such circumstances, the "question is not whether counsel's actions were unreasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland*'s 'deferential standards.'" *Id.*

Courts are reluctant to characterize tactical or strategic decisions by trial counsel as ineffective assistance. *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002). A "strong presumption" exists that counsel's actions were the function of trial tactics and not "sheer neglect." *Harrington*, 131 S. Ct. at 790. This rule, however, is not absolute where the purported strategic decision is based upon an error or ignorance of the law by trial counsel. *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2nd Cir. 2009) (omissions based upon "oversight, carelessness, ineptitude or laziness" cannot be explained as "trial strategy"); *Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) (a strategic choice made without a professionally competent investigation of the Petitioner's options is "erected upon . . . a rotten foundation" and is not entitled to deference).

## III.    Analysis

### A.    Ground One

Petitioner argues that his writ for habeas corpus should be issued because the Solicitor improperly injected race into the trial testimony and his closing argument, thereby denying the Petitioner due process of law at his second sentencing proceeding. It is well settled that the courts must engage in "'unceasing efforts' to eradicate racial prejudice from our criminal justice system." *McCleskey v. Kemp*, 481 U.S. 279, 310 (1987) (*citing Batson v. Kentucky*, 476 U.S. 79, 85 (1986)). Indeed, "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). This vigor in eradicating racial discrimination from the criminal justice system is grounded on the premise that "the

inestimable privilege of trial by jury . . . is a vital principle, underlying the whole administration of criminal justice." *Ex parte Milligan*, 4 Wall 2, 123 (1866). "The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence." *Turner v. Murray*, 476 U.S. 28, 35 (1986).

There is little question that a "prejudicial argument by the prosecutor poses a serious threat to a fair trial" because it can "undermine the jury's impartiality." *Miller*, 583 F.2d at 706. The Fourth Circuit has recognized that "a prosecutor's improper argument may so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998). A court reviewing an alleged improper argument of a prosecutor "must consider whether the remarks were, in fact, improper, and, if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." *Id.* This is especially true where the prosecutor's remarks related to an appeal to racial prejudice related to sexual misconduct, because "few forms of prejudice are so virulent." *Miller*, 583 F.2d at 707.[2]

In evaluating the issue of prejudice from improper prosecutorial argument, the Court should look to the following factors: "(1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper

---

[2] In Gunnar Mydal's landmark study on race in America, *An American Dilemma*, he observed that "[n]o other way of crossing the color line is so attended by the emotion commonly associated with violating a social taboo as . . . extramarital relations between a Negro man and a white woman." Mydal ranked "sexual intercourse" with black men and white women as being the "highest" in the rank order of racial discrimination. Gunnar Myrdal, *An American Dilemma* 60, 606 (1946).

conduct of defense counsel; and (6) whether curative instructions were given to the jury." *United States v. Scheetz*, 293 F.3d 175, 186 (4th Cir. 2002).

The analysis concerning whether a prosecutor's improper remarks or submission of racially charged evidence are of such magnitude as to deny the defendant a fair trial is necessarily fact-driven. Some evidence may be improper but not prejudicial or simply inconsequential. In some instances, a judge's immediate and decisive instruction may effectively dispel any prejudicial effect. *Miller*, 583 F.2d at 707.

A federal court addressing a habeas petition from a state criminal proceeding must also be mindful of the limited standard of review. As earlier summarized in this order, a habeas petition should be granted only where the state court decisions are "contrary to, or involved an unreasonable application of clearly established federal law as decided by the United States Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2).

The Solicitor's submission of the "black Indian" dream evidence, reference to the African-American Petitioner's prison guard lover as "the blonde-headed lady," and description of Petitioner as "King Kong" have all been addressed by the state trial, appellate and PCR courts and found not to constitute an appeal to racial prejudice and as non-prejudicial. (Dkt. No. 25-13 at 185–191; *Bennett II*, 632 S.E.2d at 288–89; Dkt. No. 25-19 at 65–66.) The state trial court erroneously found that the prosecutor did not elicit the "black Indian" testimony where the record clearly indicates that is not correct.[3] (Dkt. No. 25-9 at 50-51; 25-13 at 185.) The "blonde lady"

---

[3] The "black Indian" dream testimony was not challenged as an appeal to racial prejudice on direct appeal. It was so challenged during PCR proceedings, in the context of a *Strickland* claim regarding appellate counsel. However, Respondents have waived any procedural bar to Petitioner's assertion that this testimony was an appeal to racial prejudice by not raising a

comment was dismissed because not every blonde woman is white. (Dkt. No. 25-13 at 187.) The "King Kong" reference was characterized as an innocent effort to describe the large Petitioner and was not an appeal to the passions and prejudice of the jury. *Bennett II*, 632 S.E.2d at 231–32.

It is notable that none of the reviewing courts evaluated the potential impact of these various racially charged statements or evidence collectively, analyzing each in isolation. Further, no court addressed what was clearly the Solicitor's calculated effort to introduce the challenged evidence. The "black Indian" testimony was elicited by the Solicitor asking the witness whether he had any dreams when he was in a coma, clearly prompting the testimony.[4] Defense counsel then objected, arguing that a prior crime victim's dream could not possibly constitute relevant evidence. The Solicitor then responded, "[h]e'll bring out the relevance." The Court overruled the objection and the "black Indian" dream was shared with the jury, creating the imagery of black "savages" chasing the white victim. (Dkt. No. 25-9 at 50–51.) Respondents now concede that testimony about a comatose dream is "unqualified evidence," that it was "odd" for the Solicitor to elicit such testimony, that the trial court "probably" should have sustained the defense's objection to that testimony, and that its relevance could be "[n]othing other than to show the impact that the incident may have had on the victim in that case." (Dkt. No. 107 at 7:23–9:20.) The South Carolina Supreme Court, however, held that "the victim's testimony about his 'black Indians' dream was not 'victim impact' evidence." *Bennett II*, 632 at 287. Further, Respondents conceded at oral argument that they could not articulate any purpose for the "black Indian" testimony other than to invoke racialized imagery. (Dkt. No. 107 at 11:14–22.).

---

procedural bar objection when responding to the petition. *See Gray v. Netherland*, 518 U.S. 152, 165–66 (1996).

[4] Respondents concede that the PCR court's finding that the Solicitor did not elicit this testimony was erroneous. (Dkt. No. 107 at 7:1–8.)

A similar scenario can be seen in the Solicitor's calculated questioning of an inmate character witness regarding Petitioner's white lover. The Solicitor asked the inmate about the prison guard who "loved" Petitioner and named her. The witness then asked if he was referring to the "real big lady," a description without any racial reference. The Solicitor then gratuitously stated, "you remember her, the blonde-headed lady." (Dkt. No. 25-11 at 500–01.) The Solicitor's carefully choreographed questioning alerted Petitioner's all-white jury that his prison guard lover was a white woman.

Modern courts have declared improper this type of prosecutor-injected references to a black criminal defendant's prior relationship with a white lover. In *Dawson v. State*, 734 P.2d 221, 223 (Nev. 1987), the Nevada Supreme Court overturned the death sentence of a black defendant after the prosecutor referenced his "physical relationship" with a white woman. The Court observed, "[w]e find great difficulty in discerning any legitimate purpose for discussing such matters in a proceeding designed to determine only the extent of punishment to be imposed" on the defendant. The Court asked whether "a black man's supposed sexual preference have anything at all to do with whether he deserves to die for his deeds?" *Id.* In a federal prosecution for bank robbery in *United States v. Grey*, 422 F.2d 1043, 1044–45 (6th Cir. 1970), the prosecutor asked a character witness whether he knew the African-American defendant was "running around with a white go-go dancer." In overturning the conviction, the Sixth Circuit described the racial reference to the defendant's lover as either a "magnificent irrelevance" or "the gratuitous reference to the race of the go-go dancer" in "a deliberate attempt to employ racial prejudice." *Id.* In *Bryant v. State*, the Texas Court of Appeals rejected the argument that the prosecutor's reference to "a white girl named Rebecca" the defendant impregnated was merely done for identification, finding that the statement "served to aggravate the lingering prejudice against interracial couples among the

jurors." 25 S.W.3d 924, 925–26 (Tex. App. 2000); *see also Moore v. Morton*, 255 F.3d 95, 115 (reference to black defendant's white wife was irrelevant and "could play to bias against interracial couples").

Petitioner's argument that the Solicitor's actions were a calculated effort to inject race is not something that was developed after the fact by shrewd appellate counsel. Petitioner's trial counsel immediately recognized the poisonous effects of the Solicitor's questioning, argued to the trial court that this was reprehensible racially charged conduct, and urged the trial court to declare a mistrial. (Dkt. No. 25-9 at 51, 63–64; Dkt. No. 25-12 at 35–36.) Defense counsel also accurately noted that the Solicitor had not offered this type of racially charged evidence in the first sentencing proceeding, when the jury included two African-American jurors. (Dkt. No. 25-9 at 63.) The Court finds the offering of such racially charged evidence only with an all-white jury to be telling.

Respondents argue that not all blonde women are white and that is technically true since an extremely small minority of African-American women have dyed their naturally dark hair blonde. But it is also true that almost all women with blonde hair are white. To accept the Respondents' argument here that the Solicitor's reference to a blond prison guard does not suggest the race of the Petitioner's lover reminds this Court of the insightful comment of the Fourth Circuit in the landmark civil rights case of *Johnson v. Branch*, 364 F.2d 177, 182 (4th Cir. 1966), that "[t]o accept such an analysis we would have to pretend not to know as judges what we know as men."

In addition to the two racially charged evidentiary submissions made by the Solicitor, he described Petitioner in closing argument as "King Kong." This argument has been characterized by the state courts as a benign reference to Petitioner's oversized physique without any racial connotation. Such a characterization ignores the long and ugly history of depicting African-

-16-

Americans as monkeys and apes, and the pejorative and inflammatory nature of such references. This history was ably addressed by Judge King, initially in dissent in *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 350–51 (4th Cir. 2006) and then as the author of the *en banc* reversal of *Jordan* in *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 274 (4th Cir. 2015). In *Jordan*, a black plaintiff asserted that the term "black monkeys" was racially offensive and created a hostile work environment. Judge King observed in dissent that "[b]y referring to African-Americans as 'monkeys,' the speaker plays on historic, bigoted stereotypes that have characterized them as uncivilized, non-human creatures who are intellectually and culturally inferior to whites" and "implied a savage, bestial sexual predilection acutely insulting to members of the African-American community." 458 F.3d at 351. Judge King revisited this issue in *Boyer-Liberto*, observing that his dissent in *Jordan* "[a]t bottom . . . recognized that the 'black monkeys' comment made by [the plaintiff's] co-workers 'is the stuff of which a racially hostile work environment is made.'" 786 F.3d at 274. In another hostile work environment case, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), the court observed that the "constant use of the word 'monkey' to describe African Americans was . . . odious. To suggest a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme." *See also Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (triable issue in hostile work environment case where supervisor compared African-Americans to slaves and monkeys).

Respondents concede that the Solicitor referred to Petitioner "as a form of a monkey." (Dkt. No. 107 at 21:14–16.) But the Solicitor's use of the King Kong reference was even more racially loaded than a comparison to the Petitioner simply as an ape or monkey. King Kong, as vividly depicted in the studio's promotional literature, involved a giant ape who escaped from

captivity, kidnapped a white woman, and went on a murderous rampage.    The racialized imagery associated with King Kong has long been recognized.    Indeed, the original German version of the movie, released in 1933 Nazi Germany, carried the title that translated to "King Kong and the White Woman."    *See* Thomas E. Wartenberg, *Humanizing the Beast:* King Kong *and the Representation of Black Male Sexuality*, *in* Classic Hollywood, Classic Whiteness, 157, 157–58 (Daniel Bernardi, ed. 2001).    Further, the placing of a sign that read "King Kong lives" near an African American employee's workstation and calling him "a monkey, a boon, an ape [and] a gorilla" were among the referenced conduct that supported a punitive damage award in a racially hostile workplace case.    *Turley v. ISG Lackawanna, Inc.*, 960 F. Supp. 2d 425, 433–34 (W.D.N.Y. 2013).



King Kong (RKO Radio Pictures 1933 (promotional poster)).

Although the legal standards associated with a racially hostile workplace case and the denial of due process arising from a prosecutor's racialized comments regarding an African American defendant in a capital murder case are obviously not the same, it is somewhat hard to credibly argue that conduct that is so over the top and inappropriate as to give rise to an employee's Title VII racially hostile workplace claim is nonetheless permissible in support of the imposition of death of a black criminal defendant.   Like the injection of the "black Indians" dream and the Petitioner's white lover, the King Kong reference is a not so subtle dog whistle on race that this Court cannot and will not ignore.

The Court is mindful that the state courts have characterized the Solicitor's King Kong statement as a harmless reference to Petitioner's immense size without any racial overtones.   The Court finds such an analysis involves "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).  The fact that Petitioner is a very large black man makes the King Kong reference even more odious and inflammatory in this case because it plays upon a racist stereotype of the bestial black savage that seems calculated to animate and excite the all-white Lexington County jury.

Under the legal standards set forth above, this Court must find the statements and/or racially charged evidence were both improper and prejudicial. *See Scheetz*, 293 F.3d at 186.  Each of the three challenged statements or actions was clearly improper.  The Solicitor's eliciting of a comatose crime victim's racially charged dream did not remotely meet any recognizable evidentiary standard and was provided simply for the power of its racialized imagery.   The Solicitor's "blonde lady" comment introduced irrelevant and racially inflammatory evidence, and was calculated to slip to the jury the fact that this large black man had a white lover while incarcerated.  The King Kong statement employed the use of long recognized racist imagery and

had no proper place in a closing argument concerning a possible death sentence. The fact that such inflammatory evidence was not presented to the first, racially diverse sentencing jury but was provided to the second, all-white sentencing jury reinforces this Court's view about both the impropriety of the comments and the Solicitor's purpose in making them.

The impropriety of the Solicitor's comments and argument are not enough, and Petitioner is obligated to demonstrate prejudice as well. To that end, the Fourth Circuit has provided a set of standards to consider when evaluating potential prejudice, which heavily support a finding of prejudice here. *Scheetz*, 293 F.3d at 186.

First, as discussed above, each of these comments, both individually and collectively, has a tendency to mislead and distract the jury and to prejudice the accused. These include references to such hot button racial issues as the Petitioner's interracial sexual relations, a crime victim being chased by black savages, and a fictionalize movie figure of a large ape who takes a white woman into captivity before engaging in a murderous rampage. Second, this is a not a situation where there was simply an isolated comment. The Solicitor made multiple statements clearly calculated to excite the jury with racial imagery and stereotypes. The fact that the Solicitor made a single reference to the Petitioner's white lover, black Indians chasing a crime victim, or King Kong does that eliminate the fact that the record contains collectively multiple instances of offensive and inappropriate racial imagery. Third, the offensive comments were intentionally placed before the jury by the Solicitor and were not the product of an inadvertent word or comment unpredictably made. Fourth, the comments cannot be excused as a response to improper conduct by defense counsel. Fifth, the trial judge gave no curative instructions when the offensive comments were made.

2:13-cv-03191-RMG     Date Filed 03/16/16     Entry Number 108     Page 21 of 42

In sum, the record clearly establishes that the challenged statements were improper and profoundly prejudicial to the Petitioner. Any finding by the state courts that such racialized comments were benign and/or non-prejudicial are "based on an unreasonable determination of the facts in light of the evidence in the state court proceeding." 28 U.S.C. § 2254(d)(2). The Court finds that the issuance of the Petitioner's writ under these circumstances is mandated by the Due Process Clause of the Fourteenth Amendment.

This Court has not made this decision lightly and without the most careful and respectful review of the state court judgments in this matter. This decision has not been made with the thought that the Petitioner is wrongfully accused; indeed, the Petitioner's guilt regarding the serious, violent state crimes for which he was tried is not at issue. This decision has not been made on a finding that the Petitioner does not meet statutory and constitutional standards for the imposition of a death sentence. The State is still free to seek the death penalty against Petitioner when this matter returns to the state courts. But a decision on death, the one judicial act that cannot be later corrected, must be made under circumstances not infected by distracting and inciting racial imagery that harken back to a dark day of our country's past. Due process requires nothing less.

Based upon the foregoing, the petition for a writ of habeas corpus is granted regarding Ground One with instructions to have this matter return to the state courts for resentencing within 180 days of this order.

**B.     Ground Two**

Petitioner asserts in Ground Two that his right to an impartial jury at his second resentencing was violated by the seating of a racially biased juror. The Magistrate Judge recommends granting relief on Ground Two. (Dkt. No. 98 at 25–38.) Respondents object. (Dkt. No. 99.) The Court agrees Petitioner's right to an impartial jury was violated, and that he is therefore entitled to relief on Ground Two.

-21-

A defendant has a constitutional right to an impartial jury in sentencing proceedings. "Due process alone has long demanded that, if a jury is to be provided to the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2001). In fact, "it is the jury that is a criminal defendant's fundamental protection of life and liberty against race or color prejudice." *McCleskey*, 481 U.S. at 310. Potential jury bias in capital sentencing must be given the greatest scrutiny, because "[t]he risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence," yet, "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate." *Turner*, 476 U.S. at 35. "[A] juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified . . . ." *Id.* Thus, if "even one [partial] juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

Juror bias is "a state of mind that leads to the inference that the juror will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). Determining whether a juror is biased is difficult, however, because the juror may be unaware of his bias or may actively conceal it. *See Smith v. Phillips*, 455 U.S. 209, 221–22 (1982) (O'Connor, J., concurring). Juror bias may be proven by evidence of actual bias, or implied by law regardless of actual bias. *United States v. Wood*, 299 U.S. 123, 133–34 (1936). Although finding juror bias by implication is possible, it is disfavored and reserved for "extreme situations." *Smith*, 455 U.S. at 222–23 (O'Connor, J., concurring). The usual "remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215 (majority opinion); *see*

*also Miller v. Fenton*, 474 U.S. 104, 115 (1985) (considering potential juror bias to be a factual issue under 28 U.S.C. § 2254(d)).

The Fourth Circuit has never reached the question of whether proven juror bias is sufficient to overturn the verdict, or whether the defendant is also required to prove that the bias was prejudicial. *Gardner v. Ozmint*, 511 F.3d 420, 429 & n.2 (4th Cir. 2007). One other circuit considering the question has held that proven bias is sufficient to overturn the verdict. *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001). The Sixth Circuit's position accords with Supreme Court jurisprudence. *See United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) ("'Had [the biased juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [the juror] for cause, the sentence would have to be overturned.'" (quoting *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988))); *Rose v. Clark*, 478 U.S. 570, 578 (1986) ("Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury.").

Petitioner alleges that the Juror had actual racial bias when seated on the second sentencing jury. PCR counsel informally approached the Juror in 2007 with questions about his experience as a juror at Petitioner's second sentencing proceeding. PCR counsel asked the Juror why he thought Petitioner killed the victim. The Juror responded, "because he was just a dumb nigger." (Dkt. No. 25-16 at 18–19.)

Petitioner later called the Juror as a witness at the PCR evidentiary hearing. PCR counsel questioned the Juror about the 2007 interview:

> Q.     . . . And do you recall me asking you the question, indicating that this was a strange crime and why did you think that Mr. Bennett had killed the victim?
>
> A.     I don't recollect the exact words, but I remember, yes, I guess.

-23-

. . .

Q.     Do you recall what your answer was?

A.     Yes.

Q.     And what was your answer to that question?

A.     I don't—I don't really recall which question that I answered what you're going to make me say—I don't recall.

Q.     Okay.  Do you recall ever saying, "because he was just a dumb nigger"?

A.     Some words like that, yes.

Q.     Okay.  Okay.  Would you like to change any of the words that I just said?

A.     Yeah.  You know, I apologize for saying that one word, but after going through that thing for an entire week and all the evidence piling up against him, that was just the way I felt about it.

Q.     All right.  And I don't want to put words in your mouth.  You're not—I didn't misstate what you said; right?

A.     No, I said that.

(Dkt. No. 25-16 at 18–19.) On cross-examination, the Juror testified that neither he nor the other jurors ever used any kind of racial epithet during the course of deliberations and that the fact that Petitioner is black did not play any part in his decision.  (*Id.* at 22–24.)  He stated, "I'm not prejudiced.  You know, like I say, I said the wrong word.  I shouldn't have said it."  (*Id.* at 24.)

The PCR court found that Petitioner failed to establish the Juror was actually biased when he was a juror, explaining that his "testimony establishes only how [he] felt about the Applicant's conduct when asked in June 2007.  Nothing in [his] testimony at the PCR hearing establishes that he was biased against Applicant at the time of trial because of Applicant's race."  (Dkt. No. 25-19 at 71–72.)  The PCR court further found that "it is unclear from [his] testimony when he came to the conclusion that Applicant was a racial epithet" and that it "appears that his reflection was how

he felt at the time he was speaking with Applicant's counsel in 2007, not at the time of the sentencing trial in 2000." (*Id.*)

Whether Rule 606(b) of the Federal Rules of Evidence prohibits use of post-verdict juror testimony regarding racial bias infecting the juror's personal thought processes during jury deliberations to impeach the verdict is an unsettled question of federal law. *See United States v. Villar*, 586 F.3d 76 (1st Cir. 2009) (holding that Rule 606(b) does bar such evidence but that application of Rule 606(b) to prohibit admission of evidence regarding racial biases is unconstitutional); *United States v. Benally*, 546 F.3d 1230, 1238–39 (10th Cir. 2008) (holding that Rule 606(b) bars such evidence and that the prohibition is constitutional); *Williams v. Price*, 343 F.3d 223, 237–39 (3d Cir. 2003) (holding that Supreme Court precedent did not clearly establish that a state evidentiary "no impeachment" rule with no exception for juror testimony about juror racial bias was unconstitutional); *United States v. Henley*, 238 F.3d 1111, 1120–21 (9th Cir. 2001) (stating in dicta that Rule 606(b) should not bar such evidence); *Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir. 1987) (same). But this case does not present that issue to the Court. Faced with an allegation of actual juror bias, the PCR court correctly applied federal law by providing a hearing in which Petitioner had the opportunity to prove actual bias. The South Carolina Rules of Evidence, not the federal rules, were applicable in that hearing. South Carolina allows juror testimony regarding allegations of racial bias. *State v. Hunter*, 463 S.E.2d 314, 316 (S.C. 1995).

So, as Petitioner and Respondents agree, the issue before this Court is simply whether the PCR court made an unreasonable factual determination, based upon the evidence before it, when it found that the Juror was not actually racially biased against Petitioner. (*See* Dkt. No. 107 at 29:1–22, 39:7–11.) The PCR court's determination is unreasonable if there is not "fair support in the record for" its conclusion that the Juror was impartial. *See Patton v. Young*, 467 U.S. 1025,

1038 (1984). There is no dispute that the PCR court's finding that the Juror was in fact an impartial juror turns on whether his statement that Petitioner "was just a dumb nigger" expressed an opinion that he held during the sentencing proceeding. (*See* Dkt. No. 107 at 31:12–16, 32:20–25 (Respondents agreeing that Petitioner should be granted habeas relief if the Juror's statement "was his view at the time of the deliberations").) For the below reasons, the Court finds that the PCR court made an unreasonable factual determination, lacking fair support in the record, when it found that Petitioner failed to prove that the Juror was actually biased during the sentencing trial.

1.    The Juror Unambiguously Admitted to Racial Bias at the Time of
      Petitioner's Sentencing Trial

The PCR court's finding that the Juror's statement that Petitioner was "just a dumb nigger" may have merely reflected his feelings about Petitioner in 2007, and not how he felt about Petitioner at the time of sentencing, was an unreasonable determination of the facts. PCR counsel asked the Juror, "Why *did* you think Mr. Bennett *had* killed the victim?" The Juror answered, "Because he *was* just a dumb nigger." (Dkt. No. 25-16 at 18–19 (emphasis added).) Further, in explaining his "dumb nigger" statement, the Juror apologized for the racial epithet but stated that after going through the one-week trial with the evidence mounting up against Petitioner "that was just the way I *felt* about it." (*Id.* (emphasis added).)

The wording of the questions and of the answers unambiguously indicate that the Juror's statement expressed his thoughts at the time of the sentencing proceeding in 2000. PCR counsel and the Juror were not speaking in the past tense by mistake; they were speaking in the past tense because they were speaking of a past event—the 2000 sentencing trial. Moreover, the Juror testified that he developed his opinion that Petitioner "was just a dumb nigger" when sitting through the trial "for an entire week and all the evidence piling up against him. . . ." (*Id.*) The PCR court's disregard of the actual words used by the witness in favor of speculation that the Juror

may have acquired his racial bias sometime after the sentencing hearing is without support in the record.

### 2.    The Record Establishes That the Juror Was Actually Biased

The PCR court unreasonably determined that

> There was no testimony or probative evidence presented that established [the Juror] viewed African-Americans as inferior to Whites, or that [the Juror] did not properly consider and weigh all of the evidence presented at Applicant's trial in making his finding as a juror.

(Dkt. No. 25-19 at 73.)  The Juror's testimony that he stated that he thought Petitioner was guilty "because he was just a dumb nigger" is highly probative evidence establishing that the Juror viewed black people as inferior to white people, and that he did not properly consider the evidence presented at trial.  The use of the word "nigger" to refer to black people is "[f]ar more than a 'mere offensive utterance[;]' the word 'nigger' is pure anathema to African-Americans." *Spriggs*, 242 F.3d at 185.  Like the Ninth Circuit, this Court has "considerable difficulty accepting . . . that, at this time in our history, people who use the word 'nigger' are not racially biased." *United States v. Henley*, 238 F.3d 1111, 1121 (9th Cir. 2001).  Indeed, Respondents now concede that "there is no dispute that the statement is racist." (Dkt. No. 107 at 26:13–15.)

Moreover, by indicating that Petitioner "was *just* a *dumb* nigger," the Juror expressed the view that black people are inferior to other people because they are less intelligent.  He unambiguously used "just" as a synonym for "merely," which means "nothing more than."  "Dumb" means "unintelligent."  Petitioner, according to the Juror, is "nothing more than" an "unintelligent" "nigger."  That statement can only be construed as an expression of racial bias.

Nor did the Juror express a generalized racial bias that required the PCR court to infer that the Juror was actually biased when sentencing Petitioner.  The Juror stated that this specific Petitioner "was just a dumb nigger."  And he further stated that Petitioner was culpable in the

specific action before the jury on which the Juror was seated "because he was just a dumb nigger." The Juror showed that his racial bias actually influenced his thoughts on Petitioner. Indeed, it is difficult to imagine how the Juror could have stated his bias and its impact on Petitioner's sentencing more clearly. Moreover, if this blatant statement of racial hostility does not amount to evidence of constitutionally impermissible racial bias, it is hard to imagine what evidence could meet that standard.

### 3.    The Record Contradicts the Juror's Denial of His Own Bias

The PCR court unreasonably credited the Juror's testimony that his decision was based solely upon the evidence presented at trial, that race had nothing to do with his decision, that he did not believe black people are inferior to white people, and that his words "just a dumb nigger" were not reflective of his views on race or Petitioner. (Dkt. No. 25-19 at 72–73.) Federal courts do not "redetermine credibility of witnesses whose demeanor has been observed by the state trial court," *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983), but that does mean that federal courts always must find it reasonable for state courts to credit a witness's testimony to the exclusion of the entire record. The record in this case contradicts the Juror's denial of racial bias so thoroughly that no court could reasonably credit his denial. The Juror's statement that he believed Petitioner to be "just a dumb nigger" cannot be reconciled with his testimony that he did not view black people as inferior to white people. It is unreasonable to find that a juror who states that a black defendant is guilty "because he was just a dumb nigger" in fact had no racial bias regarding that person simply because he later proffers a bald denial of bias. Such denials are properly accorded little weight. *See, e.g., McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 558 (1984) (Brennan, J., concurring in the judgment) (observing that "the bias of a juror will rarely be admitted by the juror himself"); *United States v. Heller*, 785 F.2d 1524, 1527 (11th Cir. 1986) ("It is inconceivable that by merely denying that they would allow their earlier prejudiced comments to

influence their verdict deliberations, the jurors could have thus expunged themselves of the pernicious taint of anti-Semitism."); (Dkt. No. 107 at 32:3–16 (Respondents agreeing that people generally do not admit to being racists)).  The Juror's denial of his own racial bias is especially unpersuasive given his testimony that he regretted his admission because it jeopardizes Petitioner's death sentence:

> You know, kind of maybe after y'all [Petitioner's counsel] left after I got to thinking about it and I was like, well, why would I tell them that, you know, to help them out?  You know, I didn't—it was just kind of overwhelming.  You know, you caught me off guard.

(Dkt. No. 25-16 at 27 (testimony of the Juror).)

Thus, the PCR court's conclusion that Petitioner failed to meet his burden to prove that the Juror had actual racial bias during the sentencing trial rests on an unreasonable determination of the facts.  The evidence before the PCR court compels the conclusion that the Juror possessed a state of mind leading "to the inference that the juror will not act with entire impartiality." *See Torres*, 128 F.3d at 43.

Based on the foregoing, the Court grants Petitioner's writ of habeas corpus on Ground Two with instructions to have this matter return to the state courts for resentencing within 180 days of this order.  This is a separate and independent ground for the grant of the writ of habeas corpus.

## C.    Ground Three

Petitioner asserts that trial counsel was ineffective for failing to challenge the Solicitor's decision to seek the death penalty as improperly based on race.  Petitioner claims that the Solicitor sought the death penalty because the victim was African-American, "to give the impression that charging decisions were unbiased."  (Dkt. No. 26 at 45.)  The Court agrees with the Magistrate Judge's recommendation that this claim has no merit.  Petitioner has not objected to that recommendation.

As a threshold matter, the parties agree that this claim is procedurally barred. Because the claim has no merit, the Court does not reach the question of whether the PCR counsel was ineffective for failing to preserve this argument in PCR proceedings. *Martinez* requires that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." 132 S. Ct. at 1318.

Petitioner asserts a selective prosecution claim. Prosecutors have broad discretion, but they cannot make a prosecutorial decision "based on an unjustifiable standard such as race." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks omitted). To challenge a prosecutorial decision as race-based, a defendant must demonstrate that the "prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 465 (internal quotation marks omitted). To show a discriminatory effect, the defendant "must show that similarly situated individuals of a different race were not prosecuted." *Id.* To show a discriminatory purpose, the defendant must show that the decision-maker intended the discriminatory effects—mere awareness of discriminatory effects is insufficient. *McCleskey*, 481 U.S. at 298.

Petitioner presents statistics showing that the Lexington County Solicitor sought the death penalty 28 times from 1977 to 2000 (excluding retrials), but that only three of those cases involved an African-American victim. (Dkt. 46-2 (Pet. Ex. B).) The statistical significance of the fact that only 10.7% of the cases in which the Solicitor sought death penalty involved an African-American victim is unclear, given that African-Americans comprised only 12.6% of the population of his jurisdiction in 2000. *See American FactFinder*, U.S. Census Bureau (2000). Even if those statistics are significant, to prove selective prosecution, Petitioner must show that the Solicitor did not seek the death penalty for similarly situated defendants whose victims were white. But

Petitioner's statistics suggest that the Solicitor is quite likely to seek the death penalty when the victim is white.

Petitioner also compares his case to that of Calen J. Radwill. (Dkt. No. 46 at 45–46.) The timing and details of Mr. Radwill's case are similar to Petitioner's case except that Mr. Radwill and his victim were white, yet, according to Petitioner, the Solicitor did not seek the death penalty. (*Id.*) Petitioner's assertion is incorrect. The Solicitor did seek the death penalty. (*See* Dkt. No. 60-1.) Moreover, Mr. Radwill was seventeen years old at the time of his crimes, and so he was not similarly situated with Petitioner.

Petitioner fails to present anything remotely suggesting that the Solicitor discriminates in his capital prosecutions according to the race of the victim. Petitioner's selective prosecution claim, therefore, has no merit, and because it has no merit, the procedural default of this claim cannot be excused and Petitioner is not entitled to relief as to Ground Three.

### D.    Ground Four

Petitioner asserts that trial counsel was ineffective for failing to inquire into the racial attitudes of the veniremen during *voir dire*. The Magistrate Judge recommended that Petitioner be denied relief on this claim, and Petitioner has not objected to that recommendation.

The Supreme Court has "noted that a defendant may not complain about the failure to question prospective jurors on racial bias unless he has specifically requested such an inquiry" because "the decision to question prospective jurors about racial bias is best left in the hands of trial counsel." *Sexton v. French*, 163 F.3d 874, 886 (4th Cir. 1998) (citing *Turner*, 476 U.S. at 36–37)). "On habeas review, federal courts generally accord 'particular deference' to the judgment of trial counsel during *voir dire*." *Gardner*, 511 F.3d at 426. Counsel's actions during *voir dire* are presumed to be matters of strategy. *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001); *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997); *Teague v. Scott*, 60 F.3d 1167, 1172

(5th Cir. 1995). Whether that strategy "falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 669, "is to be evaluated from counsel's perspective at the time of the alleged error," *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

Petitioner's trial counsel did not request to question veniremen on their racial attitudes during *voir dire*. Following *voir dire*, a jury of eleven white jurors and one black juror was seated. The lone black juror was properly removed from the jury after he informed the court that he knew family members of the victim "pretty well" and that he did not "feel that [he] could just sit and be impartial." (Dkt. No. 25-8 at 137–48.) When the only black juror was removed from the jury, trial counsel then moved to ask the "remaining jurors [about] their racial attitudes." The trial court denied the motion. (*Id.* at 153.)

At the PCR hearing, defense counsel testified that they were concerned about racial issues and that they were aware that the State planned to introduce evidence about Petitioner's attack on two white men at a Pizza Hut. (Dkt. No. 26-16 at 38–39, 44, 103, 124.) Lead defense counsel testified that there was no strategic reason for failing to request *voir dire* on racial attitudes. (*Id.* at 45.) He further testified that, although he was aware that he was could *voir dire* on racial attitudes,[5] the probability that a juror would admit to racial bias was low, and such questions both risked offending potential jurors and risked injecting race into the proceedings. (*Id.* at 53–53.)

---

[5] At the PCR hearing, counsel for the State asked Petitioner's lead defense counsel, "were you aware going into the case that under *Turner v. Murray* you had a right to . . . .inquire on voir dire as to the jurors' beliefs on race?" Counsel answered, "yes." (Dkt. No. 25-16 at 53.) *Turner* holds "that a capital defendant that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 476 U.S. at 36–37. Petitioner was not accused of an interracial crime. However, counsel was certainly entitled to ask to *voir dire* prospective jurors on their racial attitudes, and his testimony clearly indicates that he believed that he would have been permitted to do so if he chose.

The PCR court found that counsel's decision to forego *voir dire* on racial attitudes was not deficient under the highly deferential standard applied to counsel's *voir dire* performance. The Court agrees. The PCR court's finding is well supported by the record. Defense counsel testified that he was aware of the potential for racial prejudice in this case and of the possibility of questioning prospective jurors on their racial attitudes, and that they made a deliberate decision not to do so. Although defense counsel disclaimed any "strategic reason" for that decision, the lead defense counsel's testimony indicates that he believed—and had good reason to believe—that the risks of such questioning outweighed the likely benefit. That is, by definition, a strategic decision. It must be evaluated from counsel's perspective during *voir dire*. *See Kimmelman*, 477 U.S. at 381. At the time of *voir dire*, the venire was not all white, Petitioner was not accused of an interracial crime, the Solicitor had not yet inappropriately injected race into the proceedings (*see* Ground One, *supra*), and the prosecution of the first sentencing did not suggest that the Solicitor would do so. Counsel feared offending potential jurors or injecting race into the proceeding, and counsel doubted that questioning in *voir dire* would reveal potential jurors' racial biases, if such biases existed. The record fairly supports the PCR court's finding that defense counsel's performance was not deficient. Accordingly, Petitioner is not entitled to relief as to Ground Four.

### E.    Ground Five

Petitioner raises three separate claims of ineffective assistance of trial counsel in Ground Five. He claims trial counsel was ineffective for: (1) failing to object to statements made by the Solicitor during his opening statement and closing argument; (2) failing to object to the trial court's instructions twice suggesting to the jury that another court would review the case; and (3) failing to object to a jury instruction that suggested to the jury that it could only consider Petitioner's character in the context of aggravating evidence rather than mitigating evidence. The Magistrate

Judge recommended that Petitioner be denied relief as to Ground Five. Petitioner objects to that recommendation, but his objection is limited only to the first claim asserted under Ground Five— that trial counsel was ineffective for failing to object to statements made by the Solicitor during his opening statement and closing argument.

       1.    <u>Failure to Object to the State's Opening Statement and Closing Argument</u>

In his first claim under Ground Five, Petitioner asserts that a number of comments made by the Solicitor during his opening statement and his closing argument were dehumanizing, inflammatory, or racially loaded. (Dkt. No. 46 at 54–55.) Petitioner asserts that trial counsel was ineffective for failing to object to all of the Solicitor's comments rather than just those where the Solicitor compared Petitioner to "King Kong" and "a caveman." Essentially, Petitioner reasserts the argument that the Solicitor deliberately injected race into the proceedings as a *Strickland* claim, arguing that had trial counsel performed effectively, the state courts would have found a due process violation. (Dkt. No. 100 at 13–14 ("[B]ecause trial counsel did not lodge appropriate objections, the South Carolina Supreme Court was not previously presented with the sheer number of dehumanizing and racially-loaded terms . . . .").)

Although the Court agrees that the Solicitor deliberately injected race into the sentencing proceedings (*see* Ground One, *supra*), the Court cannot agree that trial counsel was ineffective under *Strickland* in responding to the Solicitor. Trial counsel did object to the Solicitor's injection of race in a way that allowed counsel to argue that the proceedings were rendered fundamentally unfair; the trial court did rule on the merits of that argument; the South Carolina Supreme Court likewise ruled on the merits of the issue on direct appeal. (Dkt. No. 25-13 at 12–14; Dkt. No. 25-19 at 129, 137.) Petitioner objects that the South Carolina Supreme Court did so without "important information that places the solicitor's word choices in context"—*i.e.*, the full panoply of racial comments. (Dkt. No. 100 at 13.) But, as the PCR court noted, the South Carolina

Supreme Court reviewed the entire record when it considered on direct appeal whether some of the comments violated Petitioner's due process rights and found that they did not. *See Bennett II*, 632 S.E.2d at 288 ("The [Solicitor's] arguments must be viewed in the context of the entire record, and the relevant question is whether the comments infected the trial with unfairness so as to make the resulting conviction a denial of due process.").

Because "the South Carolina Supreme Court did not rely upon a procedural bar in rejecting" Petitioner's argument that the Solicitor impermissibly injected race into the sentencing proceeding, the PCR court reasonably found that Petitioner was not prejudiced by a failure of trial counsel to raise contemporaneous objections to racial comments. (*See* Dkt. No. 25-17 at 239.) And, although the PCR court did find the trial court relied on a procedural bar in rejecting those arguments, that finding is more nuanced. The trial court mentioned the lack of contemporaneous objections as buttressing its finding that certain remarks were not appeals to racial prejudice, but it did not find that Petitioner was procedurally barred from presenting the argument. (*See* Dkt. No. 25-13 at 12, 14.) Instead, the trial court ruled on the merits of the claims, *e.g.*, "I find that, viewing the Solicitor's argument in the context of the entire record and its reasonable inferences, the analogy to 'King Kong', mentioned only one time, was not an appeal to racial prejudice." (*Id.* at 13.) The PCR court reasonably found that additional objections to remarks such as "beast of burden" or "bear of a fellow" would not have resulted in a different outcome. Neither at trial nor on direct appeal did trial counsel's performance prejudice the argument that the Solicitor's racial remarks rendered the sentencing proceeding unfair.

> ## 2.     Failure to Object to the Trial Court's Instruction Regarding Appellate Review

In the second claim under Ground Five, Petitioner asserts that trial counsel should have objected to two of the sentencing court's statements to the jury, which indicated that his

instructions on the law were reviewable. The sentencing judge twice told the jury that they had to accept his instructions on the law as he gave them but that if he was wrong, "there [was] a time and place for it to be corrected." (Dkt. No. 25-8 at 169; Dkt. No. 25-12 at 135 ("[I]f I'm wrong there is another time and place for it to be corrected.").) Petitioner claims that trial counsel should have objected to these instructions because they implied the existence of appellate review. The PCR court found that Petitioner failed to establish either deficient performance or resulting prejudice as to this claim. (Dkt. No. 25-19 at 77.)

In *Caldwell v. Mississippi*, the United States Supreme Court held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. 320, 328–29 (1985). In that case, the prosecutor had stated, "Now, they would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision." *Id.* at 325. The Supreme Court cautioned "that the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role" as such an instruction "could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in." *Id.* at 333.

The PCR court found the trial court's instructions in this case did "not approach the direct statements of unfettered appellate review" by the prosecutor in *Caldwell*, nor was there any "reasonable likelihood that the jury would have understood those remarks as implying that the appellate court had unfettered review of the jury's verdict in either phase." (Dkt. No. 25-19 at 80.) The record fairly supports the PCR court's findings. The sentencing judge's statements referencing future review were only directed to his instructions on the law. His statements about

"another time and place" informed the jury that they were not to alter his instructions on the law based on their own beliefs about what the law was or what it should have been. There was no reason for trial counsel to object to the sentencing court's instruction.

> 3.    Failure to Object to the Trial Court's Instruction Regarding the Consideration of Character Evidence

In his third claim under Ground Five, Petitioner contends that trial counsel should have objected to the trial court's instructions to the jury on character evidence. According to Petitioner, "the court specifically instructed the jurors that they could consider Bennett's character in the context of aggravating evidence, but conspicuously absent was a similar instruction that the jurors could also consider character as mitigation." (Dkt. No. 46 at 66.)   The PCR court rejected this claim, finding that

> The instructions specified that the State had the overall burden of proof, and that Applicant did not have any burden.  The portion of the charge complained of by Applicant—referring to character evidence—merely sought to differentiate between evidence relating only to Applicant's bad character, from evidence of a statutory aggravating circumstance(s).  The jury instructions clearly prohibited the jury from imposing a death sentence, unless it first unanimously found that the State had established one statutory aggravating circumstance beyond a reasonable doubt. On the other hand, evidence of his bad character was limited to consideration of his bad character.  This accurately stated South Carolina law.

(Dkt. No 25-17 at 98.)  The PCR court reasonably found that the sentencing judge's instructions did not preclude the jury from considering character evidence in mitigation.  The court's specific reference to character evidence while discussing statutory and non-statutory aggravating factors advised the jury that there was limited evidence that they could consider in aggravation.  (*See* Dkt. No. 25-19 at 146–46.)  On the other hand, the court clearly instructed the jury that they were "required to consider any circumstance of any nature whatsoever as a reason for not imposing the death penalty.  Any factor may be taken into account as the reason for not imposing the death sentence." (Dkt. No. 25-12 at 151.)  The sentencing court's instructions were not objectionable as

they informed the jury that they had to consider any evidence in mitigation, which included character evidence and more.

For foregoing reasons, Petitioner is not entitled to relief regarding any claims presented under Ground Five.

### F.    Ground Six

Petitioner asserts that his appellate counsel was constitutionally ineffective for failing to argue on direct appeal that evidence of Petitioner's assault of Mr. Gilbert and another person at a Pizza Hut, which was unrelated to the murder for which Petitioner was being sentenced, should have been excluded under Rule 403 of the South Carolina Rules of Evidence as prejudicial evidence without any probative value. The Magistrate Judge recommended that relief be denied as to Ground Six, and Petitioner has not objected to that recommendation.

At Petitioner's second sentencing hearing, the State introduced evidence that Petitioner assaulted Shannon Gilbert (who testified about his "black Indians" dream, *supra*) and Aaron McGough at a Pizza Hut approximately thirty months before the murder at issue in sentencing. The State presented multiple witnesses, including the victims, the victims' mothers, and witnesses to the assaults. Photographs of the victims in the hospital following the assaults were entered into evidence. Defense counsel objected to photographs, arguing that they were inflammatory, and to the mothers' testimony. In memorializing the objections, defense counsel explained, "what we objected to was any testimony about the extent of the injuries suffered by the boys in the Pizza Hut incident as being inappropriate, victim impact type of information and having nothing to do with the particular crime that Mr. Bennett is on trial for now." The trial court overruled the objection.

Appellate counsel only argued on direct appeal that the mothers' testimony, the photographs, and the Mr. Gilbert's testimony about "black Indians" were impermissible victim impact evidence. (Dkt. No. 25-13 at 234–49.) The South Carolina Supreme Court found that all

-38-

of that evidence was evidence of the nature of Petitioner's prior crime and not victim impact evidence. *Bennett II*, 632 S.E.2d at 286–87. South Carolina law permits, in a sentencing hearing, the introduction of proof of character by a defendant's prior conviction. *Id.* at 287 n.2. The South Carolina Supreme Court noted that, although defense counsel had made relevance and Rule 403 objections, appellate counsel did not raise those arguments on appeal.

> [I]t appears Appellant's objection to the hospital photographs was based on Rule 403, SCRE (excluding relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice). Finally, Appellant objected to the introduction the victim's dream on the grounds of relevance. Before this Court, however, Appellant did not couch these objections in terms of relevance or a Rule 403 analysis. Instead, the only theory Appellant presented to this Court on this issue was that this evidence should have been excluded as impermissible victim impact evidence of prior crimes.
>
> Because the evidence in this case was not victim impact evidence, Appellant's argument must fail. When asked to do so, we will consider arguments regarding the types of evidence of prior crimes that should and should not be admissible in a capital sentencing proceeding. However, we feel that the delicate task of balancing the duty to conduct a sentencing inquiry "broad in scope," *Dawson*, 503 U.S. at 164, 112 S. Ct. 1093, against the need to protect a capital defendant from unfair prejudice and prevent a capital sentencing proceeding from transmuting into a sentencing referendum on all of the defendant's prior crimes is only properly performed when that case is presented. Such a case would no doubt involve considerations of when the introduction of evidence renders a proceeding so unfair as to violate due process, *see Payne*, 501 U.S. at 831, 111 S. Ct. 2597 and also would implicate our rules of evidence; rules which, at the most basic level, allow proof of character by specific instances of conduct. *See* Rule 405, SCRE.

*Bennett II*, 632 S.E.2d at 286–87.

The PCR court found that appellate counsel's failure to challenge the Pizza Hut assault evidence on relevance and Rule 403 grounds was not prejudicial under *Strickland*. (*See* Dkt. No. 25-19 at 118–27.) To show prejudice, Petitioner must show that, but for appellate counsel's failure, Petitioner would have prevailed on his appeal. *Smith v. Robbins*, 528 U.S. 259, 285–89 (2000).

This Court agrees that Petitioner has failed to show that he would have prevailed on direct appeal, had appellate counsel challenged the Pizza Hut assault evidence on relevance and Rule 403 grounds. The South Carolina Supreme Court's opinion does not indicate that the majority affirmed a death sentence because appellate counsel had incorrectly presented evidentiary objections, which were preserved at trial. The majority's observation that appellate counsel did not raise relevance or Rule 403 arguments on appeal was a comment directed to the dissenting opinion (*Bennett II*, 632 S.E.2d at 289–91), not an indication that it would have reached a different decision had appellate counsel raised those arguments. *See Bennett II*, 632 S.E.2d at 287 (stating that "the dissent decides an entirely different case from the one at bar"). The majority opinion held that the challenged Pizza Hut evidence was not victim impact evidence, but rather evidence demonstrating the nature of a prior assault, which, it noted, is admissible under South Carolina law. *Id.* at 229 & n.2. There is no reason to believe that the majority would have nonetheless held that evidence to be inadmissible as irrelevant. And the majority described the hospital photographs as "highly probative . . . in that they provided the clearest picture of the aggravated nature of the assault and battery." *Id.* at 229. There is, likewise, no reason to believe that a Rule 403 challenge to those photographs—or to testimony about the injuries depicted therein—would have succeeded. Petitioner, therefore, is not entitled to relief as to Ground Six.

### G.    Ground Seven

Petitioner asserts that he was denied his Sixth Amendment right to impeach and confront witnesses against him because he was denied access to potential impeachment material on the State's witnesses. The South Carolina Supreme Court addressed this claim on direct appeal of Petitioner's conviction. The Magistrate Judge found that the South Carolina Supreme Court's decision was not an unreasonable factual finding or application of federal law, and recommends

that relief as to Ground Seven be denied.  Petitioner has not objected to the Magistrate Judge's recommendation.

Before Petitioner's first sentencing, defense counsel moved to compel production of personnel records of several guards from the Lexington County Detention Center.  Defense counsel wanted to explore information about guards who may have been involved with Petitioner in cigarette smuggling.  (Dkt. No. 24-13 at 88–96.)  The trial court reviewed the requested documents *in camera.*  (Dkt. No. 24-14 at 54–55.)  After its review, the trial court required some documents to be produced, and sealed some documents for the South Carolina Supreme Court to review on appeal.  The South Carolina Supreme Court found that those sealed records contained no relevant evidence.  *Bennett I*, 493 S.E.2d at 853.

Petitioner claims that the trial court's refusal to order production of all requested documents was a *Brady* violation.  (Dkt. No. 46 at 75.)  "A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused."  *Youngblood v. West Virginia,* 547 U.S. 867, 869 (2006).  Evidence is favorable if it is either exculpatory or impeaching.  *Stickler v. Greene*, 527 U.S. 263, 281–82 (1999).  "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Youngblood*, 547 U.S. at 870.

In reviewing Petitioner's claim, the Magistrate Judge reviewed the requested documents *in camera*.  The Magistrate Judge, like the South Carolina State Supreme Court, found that the documents contain no relevant evidence.  (R. & R. 61.)  Petitioner did not object to that finding.  Moreover, the Court has again reviewed the documents at issue—personnel files of Lexington County Detention Center employees—and likewise finds production of those records unwarranted.  Petitioner, therefore, is not entitled to habeas relief on Ground Seven.

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS** Petitioner's motion for summary judgment (Dkt. No. 67) as to Ground One and Ground Two and **DENIES** Respondents' motion for summary judgment (Dkt. No. 60) as to Ground One and Ground Two of the petition; **GRANTS** Respondents' motion for summary judgment (Dkt. No. 60) as to Ground Three, Ground Four, Ground Five, Ground Six, and Ground Seven of the petition; and **ADOPTS** the Report and Recommendation of the Magistrate Judge (Dkt. No. 98) as to Ground Three, Ground Four, Ground Five, Ground Six, and Ground Seven of the petition. The Court **GRANTS** a writ of habeas corpus vacating Petitioner's death sentence pursuant to 28 U.S.C. § 2254 for the reasons set forth above. Petitioner shall be unconditionally released from the sentence of death entered by the Lexington County Court of General Sessions on July 16, 2000 unless, within 180 days, the State of South Carolina resentences Petitioner. To the extent Respondents seek to appeal this decision to the Fourth Circuit Court of Appeals, the Court will consider, on the motion of Respondents, a stay of this order pending the completion of the appeal.

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

March 16, 2016
Charleston, South Carolina