**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 16-3

---

JOHNNY BENNETT,

        Petitioner – Appellee,

    v.

BRYAN P. STIRLING, Commissioner, South Carolina Department of Corrections; JOSEPH MCFADDEN, Warden, Lieber Correctional Institution,

        Respondents – Appellants.

---

Appeal from the United States District Court for the District of South Carolina, at Charleston. Richard M. Gergel, District Judge. (2:13-cv-03191-RMG)

---

Argued: October 25, 2016          Decided: November 21, 2016

---

Before WILKINSON, KING, and HARRIS, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Harris joined.

---

**ARGUED**: Alphonso Simon, Jr., OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellants. John Henry Blume, III, CORNELL LAW SCHOOL, Ithaca, New York, for Appellee. **ON BRIEF**: Alan Wilson, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellants. Lindsey S. Vann, JUSTICE 360, Columbia, South Carolina, for Appellee.

WILKINSON, Circuit Judge:

Petitioner Johnny Bennett challenges the imposition of a capital sentence in the South Carolina courts. While recognizing full well the deferential standard of review under AEDPA, we nonetheless agree with the district court that the sentencing was suffused with racially coded references to a degree that made a fair proceeding impossible. We therefore affirm the judgment of the district court granting habeas relief.

I.

Bennett, a black man, was convicted in 1995 for murder, kidnapping, armed robbery, and larceny in a South Carolina trial court. In a separate penalty proceeding, the state, with Solicitor Donald Myers at the helm, emphasized the size difference between Bennett (6'6" and 300 pounds) and the victim Benton Smith, a black man with a slight build (5'7" and 135 pounds). A mixed-race jury sentenced Bennett to death for the murder. On appeal, the South Carolina Supreme Court upheld Bennett's convictions but reversed his death sentence, ordering the trial court to conduct a new sentencing. State v. Bennett, 493 S.E.2d 845 (S.C. 1997) (Bennett I).

The second sentencing proceeding was held in 2000. As in the first trial, Myers led the prosecution and the jury sentenced Bennett to death. But this time, the jury was composed of white jurors only. And before this all-white jury, Myers

chose to use racially charged language from the first sentence of his opening argument to his final soliloquy, casting aside the race-neutral presentation he had employed with the mixed-race jury.

The most egregious appeals to racial prejudice came in his closing argument, in which he referred to Bennett using a slew of derogatory terms. Myers admonished the jury, "Meeting [Bennett] again will be like meeting King Kong on a bad day." J.A. 1443. He also labeled Bennett a "caveman," a "mountain man," a "monster," a "big old tiger," and "[t]he beast of burden." J.A. 1420-44. In addition, Myers intentionally elicited irrelevant, inflammatory testimony from one of the state's witnesses, who recounted a dream in which he was chased by murderous, black Indians. While cross-examining a defense witness, Myers alluded to Bennett's sexual partner as "the blonde-headed lady," J.A. 1343-44, alerting the jury to the interracial nature of the relationship.

Bennett moved for a new trial, but the trial court denied his request. The court found that the "King Kong" comment "was not an appeal to racial prejudice" and was an "invited response" to the defense's portrayal of Bennett as a peaceful and helpful prison citizen. J.A. 1628-29. As a result, the court concluded, the reference did not result in a denial of due process. The

3

court analyzed the "caveman" comment separately and arrived at the same conclusions.

The South Carolina Supreme Court affirmed the death sentence, holding that the comments "did not improperly inject racial issues into the trial." State v. Bennett, 632 S.E.2d 281, 289 (S.C. 2006) (Bennett II). The court observed that the "King Kong" label "could have racial connotations" but found that Myers's use of the term "was not an appeal to the passions or prejudices of the jury." Id. at 288. Instead, the reference conveyed Bennett's "size and strength as they related to his past crimes" and was an invited response. Id. at 288-89. The court found the "caveman" comment "merely descriptive" of testimony that Bennett had twice pulled someone else by the hair. Id. at 289. The United States Supreme Court denied certiorari. Bennett v. South Carolina, 549 U.S. 1061 (2006) (mem.).

In 2008, Bennett sought post-conviction relief (PCR) in state court, arguing that the seating of a racially biased juror violated his right to an impartial jury under the Sixth and Fourteenth Amendments. While preparing for the PCR proceeding, Bennett's counsel interviewed a former juror and asked why the juror thought Bennett committed the murder. The juror responded, "Because he was just a dumb nigger." J.A. 1846. After hearing testimony from the juror, the PCR court denied relief on the

4

grounds that the juror was not racially biased at the time of the actual sentencing. The South Carolina Supreme Court denied certiorari.

Bennett filed the instant petition for federal habeas relief under 28 U.S.C. § 2254 in 2014. He raised seven grounds for relief, including prosecutorial misconduct and juror bias. After a hearing, the district court granted relief independently on both grounds, vacated Bennett's death sentence, and "return[ed] the matter to the Lexington County Court of General Sessions for resentencing within 180 days of [the] order." Bennett v. Stirling, 170 F. Supp. 3d 851, 855 (D.S.C. 2016). According to the district court, the state courts unreasonably determined that the "King Kong" comment, "black Indians" testimony, and "blonde-headed lady" remark were not intentional appeals to racial prejudice. Id. at 861-67. The district court also found unreasonable the PCR court's determination that the juror was not racially biased at the time of the sentencing. Id. at 867-72. The respondents now appeal.

II.

We review de novo the district court's decision to grant habeas relief under 28 U.S.C. § 2254. Winston v. Pearson, 683 F.3d 489, 503-04 (4th Cir. 2012).

5

A.

Under Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant a state prisoner's habeas petition unless the state court's adjudication of the prisoner's claim was legally or factually unreasonable. See 28 U.S.C. § 2254(d); Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19 (codified at 28 U.S.C. § 2254). More precisely, Section 2254(d)(1) allows relief if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." § 2254(d)(1). Circuit precedent "cannot form the basis for habeas relief." Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012). In addition, "[t]he more general the [federal] rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Section 2254(d)(2), in turn, permits relief where the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). A state court's factual determinations are presumed correct, and the petitioner must rebut this presumption by clear and convincing evidence. § 2254(e)(1).

Federal courts thus owe state tribunals significant deference. In the words of the Supreme Court, "A state court's

6

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough, 541 U.S. at 664).

Section 2254 thus imposes a high yet not insurmountable hurdle to relief. The statute "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction." Id. at 102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Federal habeas review may not be used "to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010). But AEDPA deference is not unlimited. It "does not by definition preclude relief" and "does not imply abandonment or abdication of judicial review." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

B.

Bennett alleges that the prosecutor appealed to racial prejudice in his capital sentencing proceeding. Accordingly, the "clearly established Federal law" that governs our analysis is the Supreme Court's decision in Darden v. Wainwright, 477 U.S. 168 (1986). Darden held that a prosecutor's improper comments offend the Constitution if they "so infected the trial with

7

unfairness as to make the resulting conviction a denial of due process." Id. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see Parker, 132 S. Ct. at 2153. Under this standard, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden, 477 U.S. at 180-81. Courts must conduct a fact-specific inquiry and examine the challenged comments in the context of the whole record. United States v. Young, 470 U.S. 1, 11-12 (1985).

Prosecutors, moreover, retain substantial latitude to present their case as they see fit. That latitude is not to be casually abridged. The Supreme Court has cautioned that "[t]he line separating acceptable from improper advocacy is not easily drawn." Id. at 7. Accordingly, courts "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning" or that a jury "will draw that meaning from the plethora of less damaging interpretations." Donnelly, 416 U.S. at 647.

But while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). It is beyond dispute that "[t]he Constitution prohibits racially biased prosecutorial arguments." McCleskey v. Kemp, 481 U.S. 279, 309 n.30 (1987). Racial prejudice, "odious in all aspects, is especially pernicious in the administration of justice." Rose v. Mitchell, 443 U.S. 545, 555 (1979). For

8

this reason, the Supreme Court has "engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system." McCleskey, 481 U.S. at 309 (quoting Batson v. Kentucky, 476 U.S. 79, 85 (1986)).

Finally, we remain sensitive to the Court's judgment that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." California v. Ramos, 463 U.S. 992, 998-99 (1983). Courts cannot avert their eyes from the risk that "racial prejudice infect[ed] a capital sentencing proceeding . . . in light of the complete finality of the death sentence." Turner v. Murray, 476 U.S. 28, 35 (1986) (plurality opinion).

For the reasons that follow, the prosecutor's argument here exceeded all permissible bounds.

### III.

The state courts unreasonably determined that the prosecutor's references to Bennett during closing argument were not appeals to racial prejudice. Drawing on this flawed factual finding, the courts unreasonably concluded that Bennett's right to due process was not violated.

### A.

We understand that closing arguments can be florid. Vivid expression and exaggeration for effect are many an attorney's

9

stock-in-trade. But the remarks challenged here were unmistakably calculated to inflame racial fears and apprehensions on the part of the jury. Just before the jury left the courtroom to decide whether Bennett would receive a capital sentence, Myers delivered a final summation in which he alternated between characterizing Bennett as a primitive, subhuman species and a wild, vicious animal. Myers labeled Bennett an "old caveman," a "mountain man" (twice), a "monster," and a "big old tiger." J.A. 1420-34. Referring to the murder and then to Bennett, the prosecutor remarked, "Painful, vile, cruel, inhuman, everywhere. Everywhere. Everywhere. The beast of burden." J.A. 1444. The coup de grâce in this sad story arrived when Myers warned the jury what would result if it did not impose the death penalty: "You give him life, the real Johnny will come back. You give him life and he'll come back out. Meeting him again will be like meeting King Kong on a bad day. Vile Johnny. Mean Johnny. Manipulating Johnny. Murderous Johnny." J.A. 1443.

The state courts, most notably the South Carolina Supreme Court, found that the "King Kong" comment was "not an appeal to the passions or prejudices of the jury." Bennett II, 632 S.E.2d at 288. The state supreme court explained:

> [T]he trial court properly determined that [Bennett's] size and strength were probative of the aggravating circumstance of physical torture, which the [trial]

10

> court charged to the jury. In this regard, the Solicitor's use of the term "King Kong" was not suggestive of a giant black gorilla who abducts a white woman, but rather, descriptive of [Bennett's] size and strength as they related to his past crimes.

Id. The court also found that the "caveman" comment was "merely descriptive of two of [Bennett's] past violent incidents" because the prosecutor made the remark while mentioning how Bennett pulled two individuals by their hair. Id. at 289.

With all respect, these were unreasonable findings of fact. The prosecutor's comments were poorly disguised appeals to racial prejudice. It is impossible to divorce the prosecutor's "King Kong" remark, "caveman" label, and other descriptions of a black capital defendant from their odious historical context. And in context, the prosecutor's comments mined a vein of historical prejudice against African-Americans, who have been appallingly disparaged as primates or members of a subhuman species in some lesser state of evolution. We are mindful that courts "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning." Donnelly, 416 U.S. at 647. But here, "the prosecutor's remarks were quite focused, unambiguous, and strong." Caldwell v. Mississippi, 472 U.S. 320, 340 (1985). The comments plugged into potent symbols of racial prejudice, encouraging the jury to fear Bennett or regard him as less human on account of his race.

11

The "King Kong" comment especially drew on longtime staples of racial denigration. That comment was "not just humiliating, but degrading and humiliating in the extreme." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 285 (4th Cir. 2015) (en banc) (internal quotation marks omitted). Likening Bennett to King Kong in particular stoked race-based fears by conjuring the image of a gargantuan, black ape who goes on a killing spree and proceeds to swing the frail, white, blonde Fay Wray at the top of the Empire State Building. Petitioner is right to note that the film is regarded by many critics as "a racist cautionary tale about interracial romance." Br. of Appellee at 40 (quoting Phillip Goff et al., Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences, 94 J. Personality & Soc. Psychol. 292, 293 (2008)).

In addition to the content of the remarks, the particular circumstances of this case do not leave any doubt that the challenged comments were appeals to racial prejudice, not innocent descriptions of Bennett's size and strength. The prosecutor easily could have highlighted Bennett's physical attributes in a race-neutral manner. There was no impediment to the prosecutor's ability to note "repeated examples of [Bennett's] proclivity to viciously and savagely attack others defenseless to someone of his size." Reply Br. of Appellants at 2. Indeed, the prosecutor did so in a race-neutral manner before

12

the earlier mixed-race jury. In addition, the state used cardboard figures without objection in the second sentencing to convey the size disparity between Bennett and his victim. See Br. of Appellants at 38. And of course, the jury could see Bennett and assess his size as he sat in the courtroom. See Br. of Appellee at 50. The prosecutor's references then were not only gratuitous but were, as the district court explained, "a not so subtle dog whistle on race that this Court cannot and will not ignore." Bennett, 170 F. Supp. 3d at 866.

B.

The South Carolina Supreme Court's factual determinations with respect to Myers's close led to its erroneous legal conclusion that Bennett's due process rights were not violated. It is important to consider the procedural distortion wrought by the challenged remarks. The capital sentencing determination "requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant." McCleskey, 481 U.S. at 311. Impairing the jury's ability "to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of . . . '[those] compassionate or mitigating factors stemming from the diverse frailties of humankind.'" Caldwell, 472 U.S. at 330 (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (plurality opinion)). The prosecutor's

13

closing comments here risked reducing Bennett to his race and damaged the jury's ability to consider objectively, and individually, whether mercy was warranted.

We must also evaluate the challenged remarks in the context of the record as a whole. See Young, 470 U.S. at 11-12. The prosecutor's opening statement began, "Ladies and gentlemen, you all have seen the defendant, Johnny Bennett; huge, giant man, six-six, six-seven, brutal monster size." J.A. 273. In the next breath, Myers branded Bennett a "big old brute." Id. Drawing to a close, Myers called Bennett a "big old bear of a fellow," J.A. 277, with a "[b]ig old bear of a fist," J.A. 280.

The animal imagery was shortly reinforced by racial imagery from one of the state's witnesses. The witness, Shannon Gilbert, was white and had been assaulted by Bennett several years earlier. The prosecutor asked Gilbert, "Do you have any consciousness about being in a hospital; do you know of any dreams or anything?" J.A. 393. Gilbert began to testify that he remembered only one dream from his stay at the hospital, but the defense objected on relevance grounds. Myers, who plainly knew what Gilbert would say, responded that Gilbert would "bring out the relevance." Id. Gilbert proceeded to describe his dream: "Indians were chasing me trying to kill me, and the thing that I thought was they were black. . . . [T]here might have been a link. You know, that I was remembering something about trying to

14

get away from someone." J.A. 394. At the district court hearing, the respondents conceded that Myers elicited the testimony and that they could not articulate a purpose for the testimony other than invoking racial fears.

Myers also made certain that the jury knew that Bennett had a sexual relationship with a white prison guard. Byron Collins, a defense witness, testified that Bennett helped him recover from depression while in prison. Myers's initial cross-examination consisted of a series of inquiries about whether Bennett had encouraged Collins to be disruptive or to break prison rules; Collins answered each question in the negative. The defense briefly built on this line of questioning on redirect. On recross, Myers swerved in a different direction and asked, "There was one guard that loved Johnny Bennett and that was Judie Hardee, you remember her?" J.A. 1343. Collins responded, "The real big lady?" Id. Myers answered, "Judie Hardee, you remember her, the blonde-headed lady?" J.A. 1343-44. Collins said he didn't remember, and the prosecution rested.

During his closing argument, Myers reminded the jury that Bennett was "having sex with the female guard" no fewer than seven times. J.A. 1441. While the state argues that "it is extremely common today for people to color their hair," Br. of Appellants at 46, the district court rightly noted that "almost all women with blonde hair are white," Bennett, 170 F. Supp. 3d

15

at 864. As the district court found, "The Solicitor's carefully choreographed questioning alerted [Bennett's] all-white jury that his prison guard lover was a white woman." Id. at 863.

There was therefore nothing isolated about the prosecutor's racially-charged references to Bennett during closing argument. In Donnelly, the Supreme Court found that a habeas petitioner's due process rights were not violated in part because the prosecutor's remark "was but one moment in an extended trial." Donnelly, 416 U.S. at 645. Here, in contrast, we do not have "a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." Berger, 295 U.S. at 89.

Whether the "black Indians" testimony or the "blonde-headed lady" comment would independently merit reversal is not a question we need answer. Suffice it to say that those comments do nothing to dispel our misgivings about what transpired here. Race was a recurrent theme throughout the capital sentencing proceeding, a theme designed to implant both racial fears and prejudices in the mind of the jury by playing upon ancient staples of racial disparagement and discrimination.

Our ruling does nothing to drain the adversary process of its spontaneity or to suppress the free-wheeling style that some

16

of the finest advocates employ. The proceeding here hardly needed to be run this way. We note once again that in front of the mixed-race jury at the first sentencing, Myers managed to respect the Constitution's prohibition on appeals to racial prejudice. His closing argument was race-neutral, and he did not elicit testimony on the "black Indians" dream.

When arguing before an all-white jury, however, the prosecutor suddenly and tellingly took a different, race-oriented approach. And though it should not have been necessary by the year 2000, the defense's repeated objections put Myers on notice that he had come dangerously close to crossing the constitutional line even before his closing argument began. Immediately after Myers referred to Bennett's sexual partner as "the blonde-headed lady," the defense moved for a mistrial on the basis of prosecutorial misconduct. Renewing the motion after the jury exited the courtroom, the defense argued that it had repeatedly alerted the court to "the Solicitor's attempt[s] to insert race into this case" and that the "blonde-headed lady" comment was "one of the most despicable performances [the defense had] ever seen." J.A. 1377.

There can be no fair claim that the prosecutor's tactics were invited. The state conceded before the district court that there was no improper conduct by the defense; the defense's witnesses merely portrayed Bennett as a non-violent peacemaker

17

and a model citizen in the prison community. The prosecution had every right, of course, to paint a dramatically different picture, but through evidence that pointed to the actions of the man, not the happenstance of his race.

Finally, no curative instructions were given. Unlike the trial judge in Donnelly, who directed the jury to ignore the challenged remark, 416 U.S. at 644, the state trial court here never instructed the jury on particular comments, such as the "King Kong" and "caveman" references, the "blonde-headed lady" remark, or the "black Indians" testimony. Whether curative instructions would have cured the problem or simply served to reinforce the racial references is a question we need not address, for the jury retired from the courtroom unadmonished and its deliberations reached the prosecution's desired result.

IV.

Even apart from the deference due them under AEDPA, we emphasize our respect for the efforts of our colleagues in state courts. We stress once again that prosecutors are entitled to significant latitude in pressing their closing arguments. There is no presumption of prejudice from a simple untoward remark; many challenged prosecutorial comments will amount to little more than fleeting remarks whose impact is negligible in the context of an entire trial. But the prosecutor's conduct here "so infected the trial with unfairness as to make the resulting

18

[sentence] a denial of due process." Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643).*

The record here tells the story. There is no need for elaboration on our part. The criminal justice system must win the trust of all Americans by delivering justice without regard to the race or ethnicity of those who come before it. The many instances where the system performs its duties admirably help to build the trust of the people. A proceeding like this one threatens to tear that trust apart.

For the foregoing reasons, the judgment is affirmed.

AFFIRMED

---

* Our ruling on the prosecutor's comments makes it unnecessary to consider Bennett's claim that the seating of a racially biased juror violated his right to an impartial jury.